## JOHN AIKEN *v.* THE STATE.

1. CONTINUANCE.—Even a first application for a continuance, though conforming to the requirements of the statute, is now no longer a matter of right, but its truth and merits are addressed to the sound discretion of the trial court, and if overruled will be again considered by that court on the motion for new trial, in connection with the other evidence in the case.

2. SAME—PRACTICE IN THIS COURT.—In passing upon the refusal of a continuance asked on account of the absence of a witness, the evidence adduced on the trial is likewise considered by this court for the purpose of determining whether the desired testimony was probably true, as well as whether it was material if true.

3. SAME—EVIDENCE.—The statement of a witness that a third party had admitted to him the commission of the offense for which the accused was on trial is inadmissible because hearsay, and hence a continuance should not be granted for its production.

4. EVIDENCE—FLIGHT.—Evidence that the accused fled after the commission of the offense, together with the circumstances attending his flight, is legitimate proof for the consideration of the jury, in connection with the other inculpatory evidence.

5. NEGLIGENT HOMICIDE is a killing which can only be predicated upon facts showing "no apparent intention to kill."

6. MALICE.—Though malice is the essential ingredient of murder, the principle is elementary that this specific malevolence towards the person killed may be embraced in such utter and reckless disregard of life as shows a man to be an enemy to all mankind; as when a man resolves to kill the next man he meets and does kill him; or

shoots into a crowd wantonly, not knowing whom he may kill. See the opinion for discussion of the principle.

7. Same — Intent.— It is expressly provided by the statutes of this State, that "the intention to commit an offense is presumed whenever the means used is such as would ordinarily result in the commission of the forbidden act."

Appeal from the District Court of Milam. Tried below before the Hon. W. E. Collard.

As the passenger train on the International Railway was leaving the town of Gause in Milam county, at 3 o'clock on the morning of May 7th, 1874, bound west, a shot was fired from the depot platform through the window of, and into the last or rear car, and J. B. Scobee was struck in the neck by a pistol ball, receiving a wound from which he died a few days later. On the 3d day of January, 1876, the grand jury of Milam county presented an indictment in the District Court, charging this appellant with the murder of the said Scobee. He was arraigned on the 19th day of May, 1881, and his trial culminated on the 21st day of the same month, in a verdict of guilty of murder in the second degree, and fifteen years in the penitentiary assessed as punishment.

J. R. Fraim, for the State, testified that at about 3 or 4 o'clock A. M., May 7, 1874, himself, S. N. Bailiff, Geo. Hurt and Dr. McGehee boarded the west-bound train at the depot at Gause, to go to Rockdale, taking seats in the next car to the last. Just as the train began to move, some person on the platform of the depot broke the glass out of the car window near where the witness and those with him had seats, and almost immediately he heard a single report from fire-arms and saw from the flash that it was fired from the platform. When the train had moved 300 or 400 yards, the conductor came into the car occupied by witness and others and informed them that a man in the car behind had been shot. Witness and others went into the rear car and found J. B. Scobee shot in the

neck and lying on one of the last seats in the car, and on the side of the car opposite from the Gause depot. A hole was found shot through the glass of the last window, opposite Scobee, and on the side next to the Gause depot. The train proceeded to Rockdale, where Scobee was taken to a private house, in which he died three or four days later. The witness saw him in Rockdale about three days after he was shot, and he was then dying.

Dock Hurt testified, for the State, that he was in Gause attending a ball on the night of May 6th, 1874, which was in progress when the west-bound train arrived, and he and his brother Jake went to the depot. He saw the defendant and his brother, Ed. Aiken, standing on the platform. While standing there he saw the defendant punch one of the car windows out with his pistol. The witness immediately said to his brother Jake "this is no place for us," and turned to leave. Just as he turned, a pistol fired from the place where the defendant was standing, a distance of between ten and twenty feet from the position of the witness.

On his cross-examination this witness stated that it was late at night when the shooting occurred, but he could not remember the hour, or whether or not it was before or after midnight. There were not a great number of persons on the platform at the time. The witness, defendant and others ran from the ball-room to the depot when the train arrived. The witness was at one time in the employ of the International railroad, but was not at the time of the shooting, nor at the time of this trial.

E. W. Courtney testified, for the State, that on the night the train was fired into, he was lying on a pile of lumber near the ball-room. When the train whistled he heard some one at the other end of the pile say "there is that d—d train now." The parties ran to the depot and the witness followed to see the train, and stood within ten feet of them. One of them was Ed. Aiken, and the other

the witness took to be defendant. Just as the train
moved off a shot was fired from where the two Aikens
stood, and was fired by one of them. The two then left,
going towards the ball. The witness had no intimate or
especial acquaintance with the Aikens, but knew them
when he saw them. He had seen neither of them since
May, 1874, until on this trial, and did not at first on this
trial recognize the defendant as John Aiken, nor did he
while testifying feel absolutely positive that the defendant
was the same man he took to be John Aiken on the night
of the shooting.

The cross-examination elicited from this witness the
statement that the defendant, his brother Ed. Aiken,
and many others were drinking a great deal that night,
and that a great many shots were fired in town, but no
more than one from the depot platform.

Isaac Sparks testified, for the State, that he was at the
ball that night, but not at the depot. Early on the morn-
ing of the 7th of May, after the defendant had returned
to Fraimville, he told the witness, during a conversation
in a back room of a store kept by J. R. Fraim and Enos
Aiken, defendant's brother, that he had shot into the
train. The witness told him that if he had, he had best
say no more about it. This statement he made volun-
tarily, and he was not then under arrest. The defendant
was drunk at the ball, and at the time of the conversa-
tion referred to was somewhat under the influence of
liquor, but was not boisterous or stupid.

The occurrences at the depot were detailed by S. N.
Bailiff exactly as they were by the first witness, Fraim.
In addition he testified, for the State, that a few days
after the shooting, the defendant and his brother were
tried on *habeas corpus* for shooting Scobee, and were dis-
charged. After the *habeas corpus* trial the witness and
defendant rode to Fraimville together, and *en route* the
defendant told the witness that during the *habeas corpus*

trial he thought his brother Ed. would be convicted, and that if such had been the result he, the defendant, would have got up and told the judge that it was he, John Aiken, who shot Scobee. At the ball-room, an hour or two before the arrival of the train, Enos Aiken, a brother of the defendant, asked the witness to assist him in getting defendant and Ed. away, saying that they were in a difficulty with Wm. Ditto. The witness went to the defendant, who was in the act of drawing a pistol, wrenched the pistol from his hand and took him out of the house.

Cross-examined the witness stated that the defendant was drunk at the ball; that many shots were fired in Gause that night, but only one from the depot platform. Eight or ten months before this trial the witness received from the Governor of Texas an appointment to go to Arkansas and arrest the defendant. He held these papers about six months, making no attempt to arrest the defendant, further than writing one letter to Arkansas, to which there was no reply received. He returned these papers about the last of December, 1880. At the time of the *habeas corpus* trial the witness was a friend to the defendant, and did all he could to assist him.

For the State, Thomas Oswalt testified that on May 7, 1874, at about 10 o'clock, A. M., the defendant came to him where he was at work on the Aiken farm near Fraimville, and said "I have played h—ll! I shot into the train at Gause last night." In the evening of the same day the defendant again came to where witness was and said "I have heard that a man was shot when I fired into the train last night." These statements were voluntary. The defendant was not under arrest, nor was there an officer present.

The arrest of the defendant at about daylight in the morning, in a corn-crib, sixty or seventy yards distant from a dwelling house, in Garland county, Arkansas, having a shot-gun lying by him, was proved by the evi-

dence of Lewis, deputy sheriff of Milam county. The deceased died from the effects of a gun-shot wound in the neck, as was testified by Dr. A. C. Walker.

For the defense, a number of witnesses testified positively that the defendant was lying on a bench in the ball-room, drunk and asleep, when the train arrived at the depot, while it remained there and when it left, and detailed their means of knowledge circumstantially and in detail. Evidently for the purpose of affecting the testimony of two of the State's witnesses who had testified that Dr. McGehee was of the party who boarded the train at Gause, several witnesses for the defense testified positively that the Doctor remained in the ball-room and did not go to the train at all. It was also attempted by the defense to prove by one witness that one Crunk, since dead, had admitted to him that he, Crunk, did the shooting; but this evidence was excluded.

In rebuttal the State recalled Messrs. Fraim and Bailiff, who testified positively that Dr. McGehee did board the train with them, examined the wounded man, and accompanied them to Rockdale. Dr. McGehee was shown to be dead.

*Chandler & McGregor*, and *E. P. Lott*, for the appellant.

*H. Chilton*, Assistant Attorney General, and *W. K. Homan*, for the State.

WHITE, P. J. On the 10th day of January, 1876, the indictment in this case was returned into court, charging appellant with the murder of one J. B. Scobee, in Milam county, on the 7th day of May, 1874. He was brought to trial on the 17th day of May, 1881, and on the 21st a verdict was returned against him for murder in the second degree and affixing "his punishment at fifteen years in the penitentiary."

An application for continuance was made by defendant,

which was controverted as to diligence by the district attorney, supported by affidavits as provided by statute. Code Crim. Proc. art. 564. This application was overruled by the court, and this ruling having been duly reserved by bill of exceptions is the first error complained of. Even a first application, though in conformity with the requirements of the statute, is now no longer a matter of right, but its truth and merits are addressed to the, sound discretion of the trial court, and if then overruled will be considered by that court again on the motion for new trial, in connection with the other evidence in the case. Code Crim. Proc. art. 560, subdivision 6th. In passing upon the refusal of a continuance asked on account of the absence of a witness, the evidence adduced on the trial is likewise considered by this court for the purpose of determining whether the desired testimony was probably true, as well as whether it was material if true. *Dowdy* v. *State*, 9 Texas Ct. App. 292; *Sheckles* v. *State*, 9 Texas Ct. App. 326; *Lyons* v. *State*, 9 Texas Ct. App. 636. It is hardly probable, if the absent witnesses Hurt and Joe Aiken had testified to the proposed facts stated in the application, that such testimony would have been true when so much other testimony is exhibited directly contradicting it, not the least important of which testimony was more than one voluntary statement made by defendant himself, that he was the party who did the shooting. If the other witness, Davidson, had been present, his testimony that Black Crunk, who had since died, had admitted to witness that he, Crunk, had fired the fatal shot would not only have been wanting in probability of truth, but would have been hearsay and inadmissible as evidence. "On an indictment for murder, the admissions of other persons that they killed the deceased, or committed the crime in controversy, are not evidence." Whart. Crim. Ev. sec. 225; *Sharp* v. *State*, 6 Texas Ct. App. 650; *Boothe* v. *State*, 4 Texas Ct. App.

202; *Krebs* v. *State*, 8 Texas Ct. App. 1; *Means* v. *State*, *ante*, p. 16. There is no testimony going to show that Crunk was at or near the scene of the shooting at the time it occurred. Nor did the court err in refusing to allow the witness Smith to testify to these same facts on the trial.

. It is no longer a question in this State that flight and the attendant circumstances are legitimate matters for the consideration of the jury in connection with the other inculpatory evidence. . *Gose* v. *State*, 6 Texas Ct. App. 121; *Blake* v. *State*, 3 Texas Ct. App. 581; 58 Ala. 335. The fact that defendant was arrested in Arkansas and brought back for trial brings the point directly within Blake's case, *supra*. There was no error in permitting the introduction of the testimony.

Quite a number of objections are urged to the charge of the court, but upon a careful consideration we fail to see that they are tenable. Only one is deemed necessary of notice. It is said that the charge is insufficient in that it did not submit the law of negligent homicide. As shown by the evidence, the case was not and could not be one of negligent homicide, which can only be predicated upon facts showing "no apparent intention to kill." Penal Code, art. 584; *Robbins* v. *State*, 9 Texas Ct. App. 666.

It is true that malice is the essential ingredient of murder, but the principle is elementary that "this specific malevolence towards the person killed may be embraced in such utter and reckless disregard of life as shows a man to be an enemy to all mankind; as when a man resolves to kill the next man he meets and does kill him; or shoots into a crowd wantonly, not knowing whom he may kill. 4 Black. Com. 200. In such a case it may well be said that he has malevolence towards the particular person killed, because he was one within the general scope of his malignity." *McCoy* v. *State*, 25 Texas, 33; *Lopez* v. *State*, 2 Texas Ct. App. 204.

Mr. Wharton says "Where an action unlawful in itself is done with deliberation and with intention of mischief or great bodily harm to particulars, or of mischief indiscriminately, fall where it may, and death ensue against or beside the original intention of the party, it will be murder." 2 Whart. Crim. L. (6th ed.) sec. 967. It is expressly provided by our statute that "the intention to commit an offense is presumed whenever the means used is such as would ordinarily result in the commission of the forbidden act." Penal Code, art. 50. And, as was said by Ch. J. Roberts in McCoy's case, "a man is always presumed to intend that which is the necessary or even probable consequence of his acts, unless the contrary appears." 25 Texas, 42.

Appellant, according to the evidence, fired his pistol into the window of a passenger car of a railroad train in which, it is also shown, he must have known and did know there were passengers. Deceased was struck in the neck by the ball, and died in a day or two thereafter from the effects. A more reckless disregard of human life was never shown and can scarcely be imagined, and the dastardly act under the circumstances developed is and could be in law nothing short of murder. We have found no error in the proceedings which resulted in his conviction of murder of the second degree; and the judgment assessing his punishment at fifteen years' imprisonment in the State penitentiary is in all things affirmed.

*Affirmed.*