454 P.2d 145

### The STATE of Arizona, Appellee and Cross-Appellant,

v.

### Richard Florentino TAFOYA, a. k. a. Robert Peralta Herrera, Appellant and Cross-Appellee.

No. 1870.

Supreme Court of Arizona, In Banc.

May 5, 1969.

John S. O'Dowd and David H. Lieberthal, Tucson, for appellant and cross-appellee.

Darrell F. Smith, Mesa, former Atty. Gen., Gary K. Nelson, presently Atty. Gen., and Carl Waag, Asst. Atty. Gen., Phoenix, for appellee and cross-appellant.

UDALL, Chief Justice:

This is an appeal by the defendant from a conviction of the crime of robbery. The uncontradicted facts are as follows:

On the evening of February 17, 1967 James Adams, a ticket seller at the Tucson Greyhound Bus Depot, was robbed at gun point. The gunman, whom Adams had never seen before, approached the cashier's window and demanded money. Adams gave him over $600 in cash. Five women witnessed the robbery. One, Jill Barnes, was standing on Adams' left. The other, Julie Pedro, was standing at the window facing Adams. She was grabbed by the robber and was forced to accompany him to the exit, where he released her and fled on foot.

Both witnesses gave the police descriptions of the robber, and the police artist made up a composite drawing from this information. Four days after the crime was committed Detective Schwartz showed Adams 100 to 150 photographs of known criminals but defendant's picture was not in that group and Adams told the detective so. A few days later Mrs. Barnes saw the same pictures, with the same result.

Three months later, Detective Schwartz brought four or five photographs to the bus depot where both Adams and Mrs. Barnes easily identified defendant's picture as that of the robber.

On September 22, 1967 an information charging robbery was filed against defendant, who was at that time in prison for another robbery.

On September 26, 1967 he was brought to a Tucson courtroom for arraignment. Tucson police officer Wilhelm, took Adams and Mrs. Barnes to that room for the express purpose of having them identify the robber if they could. Before they arrived he told them that the man who committed the robbery would be among the men who were going to be arraigned there.

Prior to the opening of court, defendant and ten other prisoners were seated in the jury box. All were in handcuffs. There was a score of other persons in the room—lawyers, court employees, other accuseds, etc. Defendant was the only one wearing blue prison clothes, but not the only one in a blue suit. Adams and Mrs. Barnes were told to go in, sit down, observe everyone in the room, not speak to each other, and not give any outward sign if they recognized the robber. Officer Wilhelm, who accompanied the witnesses, did not himself know which person in the courtroom was the robber. Adams left the room with officer Wilhelm and, in the hall, told him that defendant was the man who committed the holdup. The officer then got Mrs. Barnes out of the courtroom and she made the same identification without any help from Adams. Mr. John S. O'Dowd, an attorney, was in the courtroom while these events

were taking place but he had not yet been appointed to represent defendant and was not aware of the fact that an identification was being made. He did not learn these facts until they were elicited from the witnesses by the county attorney at defendant's trial in this case.

Defendant's attorney unsuccessfully moved to strike Adams' testimony concerning the "post-information show-up." The county attorney then brought out the same information from Mrs. Barnes. The testimony of both witnesses was confirmed by the testimony of officer Wilhelm, who related how Adams and Mrs. Barnes had identified defendant at the arraignment.

Adams and Mrs. Barnes also made in-court identification of defendant at the trial. The record does not show whether these identifications were the products of independent recollection or of the "post-information show-up."

Defendant raises only one question on this appeal: Did the trial court commit reversible error by admitting in evidence the testimony of Adams and Mrs. Barnes that they had previously identified him at a pre-trial post-information showup at which his attorney was not present? He contends that an affirmative answer to this question is required by three cases decided by the United States Supreme Court in 1967, which, for convenience, we shall hereinafter refer to as "the trilogy." They are: United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149; Gilbert v. State of California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178; and Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199.

The reasoning behind the trilogy is quite clear, and is clearly expressed by the following language from Wade, supra:

"The trial which might determine the accused's fate may well not be that in the courtroom but that at the pretrial confrontation, with the State aligned against the accused, the witness the sole jury, and the accused unprotected against the overreaching, intentional or unintention-al, and with little or no effective appeal from the judgment there rendered by the witness—'that's the man'." [388 U.S. p. 235, 87 S.Ct. p. 1937, 18 L.Ed.2d p. 1162]

This line of reasoning is bolstered by the further statement that:

" * * * once a witness has picked out the accused at the line-up, he is not likely to go back on his word later on, so that in practice the issue of identity may * * * for all practical purposes be determined there and then, before the trial." [388 U.S. p. 229, 87 S.Ct. p. 1933, 18 L.Ed.2d p. 1159]

In other words, the reason that the showup is critical is that it may be intentionally rigged by the police or be unintentionally suggestive because of purely fortuitous circumstances, and and in either case a witness, having made an identification will—because of pride, stubbornness, or some other reason—refuse to acknowledge his mistake even after he discovers that he has made one.

The Court, however, makes it clear that *the showup need not be a critical state*, if fairness is insured:

"Legislative or other regulations, such as those of local police departments, which eliminate the risks of abuse and unintentional suggestion at lineup proceedings and the impediments to meaningful confrontation at trial may also remove the basis for regarding the stage as 'critical.' " (388 U.S. p. 239, 87 S.Ct. p. 1938, 18 L.Ed.2d p. 1164.)

If, then, the Sixth Amendment does not bestow an absolute right to an attorney, and the need for an attorney may be removed by eliminating the criticality of the showup, then the instant case is easily distinguished from the trilogy cases. We are here confronted with a case where the witnesses, prior to the showup, identified the defendant from his picture. We think that it follows from the reasoning of the trilogy, that a showup, preceded by photographic identification, is not a critical stage of the prosecution, and that, there-

fore, the admission of the showup identification was not prejudicial error.

The reasoning of the trilogy could conceivably lead to the conclusion that the photographic identification, if unduly suggestive, was a critical stage. If so, that will eliminate a very valuable police procedure. If, upon deciding to show a "mug shot" album to a robbery victim, the police must first arrest all the persons whose pictures are in the book, secure attorneys for them, and arrange for their presence, the absurdity of the requirement would at once be apparent. Fortunately this question has been resolved by the U. S. Supreme Court in a case that arose after the trilogy decisions—namely Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L. Ed.2d 1247, in which the Court said:

> "Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eye-witnesses to exonerate them through scrutiny of photographs. The danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error. We are unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement. Instead, we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. This standard accords with our resolution of a similar issue in Stovall v. Denno, 388 U.S. 293, 301–302, 87 S.Ct. 1967, 1972–1973, [18 L.Ed.2d 1199], and with decisions of other courts on the question of identification by photograph."

The witnesses discarded over 100 pictures which were exhibited to them, as not being pictures of the robber, but promptly and positively identified two pictures out of a group of four or five which were later submitted to them. Perfection is a goal "devoutly to be wished," but unlikely to be attained. We must make the best of what we have.

Unequivocal in-court identifications were made not only by Adams and Mrs. Barnes, but also by Julie Pedro, the twenty-year-old girl who was seized by the defendant, and by the two other twenty-year-old girls who were in the bus depot at the time— Marie Ambrose and Rose Marie Antone. They observed defendant in the depot for several minutes before he commenced the robbery. They watched his movements, watched him drink from the fountain, and observed and reported these actions in detail on the witness stand. These girls selected defendant's picture before their court appearances but none of them were at the arraignment.

Adams testified that on the night of the robbery he took the money out of the drawer, slowly and "all the while I was looking at this man, and I tried to take my time to get his description." The robber was hatless. Adams testified that on the night of the robbery "I told the police the man who robbed me—his height, that it was between five foot six and five foot seven, around from 135 to 145 pounds * * * his coat, his tie, his shirt, his hair, his whole face. In fact they made a composite drawing from the description I gave them." On viewing over one hundred pictures, he told the investigating detective that the robber's picture was not included. When he saw the five pictures, much later, "I recognized the defendant right away."

On cross-examination of Adams, defendant's counsel asked: "Did you recognize the defendant as being the person in those photos, or did you recognize him as the person who robbed you?" His answer

was "I recognized the defendant as the man who robbed me at Greyhound, sir."

There is much more evidence of this kind. It would serve no useful purpose to continue detailing it. Taken together it is massive and convincing and we believe that the identification in this case was fair, correct, and positive, and that the admission of the showup result was harmless beyond a reasonable doubt.

Affirmed.

LOCKWOOD, V. C. J., and STRUCK-MEYER, McFARLAND and HAYS, JJ., concur.