**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Erwin Edward BALLARD, Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Richard Henry BRYAN, Defendant-Appellant.**

**Nos. 27202, 27367.**

United States Court of Appeals, Fifth Circuit.

Feb. 25, 1970.

John B. Clark (court appointed), Jackson, Miss., Armis E. Hawkins (court appointed), Houston, Miss., for defendants-appellants.

H. M. Ray, U. S. Atty., J. Murray Akers, Asst. U. S. Atty., Oxford, Miss., for plaintiff-appellee.

Before WISDOM, SIMPSON and CLARK, Circuit Judges.

CLARK, Circuit Judge.

These appeals come from the Northern District of Mississippi where Erwin Edward Ballard and Richard Henry Bryan, in a joint trial, were both convicted of armed robbery of a federally insured bank.[1] No motion for severance was made in the district court and because of common questions of law and fact, these appeals have been consolidated before us. There are three issues presented by each appeal, two of which are common. (1) Both appellants contend that in-court identifications by witnesses who had previously identified appellants from groups of photographs presented them by F.B.I. agents constituted violations of appellants' Fifth and Sixth Amendment rights. (2) Both appellants claim that evidence of escape from jail should not have been admitted against them. (3) Ballard contends that he should be granted a new trial because one of the chief prosecution witnesses was accused of perjury at the time of the trial and the charge was dropped after Ballard's conviction. (4) Bryan asserts that his court appointed counsel did not effectively represent him. We affirm.

## I.  GENERAL BACKGROUND.[2]

On June 11, 1967, the Slayden, Mississippi branch of the Bank of Holly Springs was robbed of approximately $21,000 by three armed men wearing straw hats, dark glasses and gloves. Following the robbery a car answering the description of the get-away car was found hidden near Slayden. Also found hidden near the car were dark glasses, hats and certain other paraphernalia identified with the holdup. Fingerprints on the car lead F.B.I. agents to Plant City, Florida in search of the appellant Bryan. Bryan was arrested in Plant City on June 15, 1968, along with James Edward Neal. Neal implicated appellant Ballard, who voluntarily surrendered to the F.B.I.

Appellants were removed to Mississippi in due course and were subsequently indicted, tried and found guilty as charged in the indictment. Neal was separately tried and convicted. Ballard was sentenced to fifteen years and Bryan was sentenced to twenty-two years. This consolidated appeal ensued.

## II.  IN-COURT IDENTIFICATION.

On July 1, 1968, after Bryan and Ballard both had been taken into custody, Special Agent Richard T. Rabideau of the Federal Bureau of Investigation interviewed Thomas Wilson and Billy Bing at the Collierville, Tennessee service station where they worked. Wilson and Bing were interviewed separately and out of the presence of each other. Rabideau handed both witnesses a stack of twenty-two photographs and asked if any of the persons pictured had been in the service station on June 10, 1968. Rabideau did not suggest that any of the people pictured had in fact been in the service station. Both Wilson and Bing had observed three men in the station on June 10, 1968 in a two-tone 1955 Chevrolet sedan with Florida license plates. They were asked if any of the men pictured had been in that group. Wilson identified Bryan and Neal, and Bing identified Bryan, Ballard and Neal, all three, as having been in that group. In the twenty-two pictures used, twenty-one individuals were pictured—Bryan appeared twice. All pictures had the sub-

---

1. The indictment charged violations of 18 U.S.C. §§ 2 and 2113(a) and (d).

2. Since there is no general attack on the jury verdict as being unsupported by the evidence, a detailed review of the evidence is not necessary for this opinion.

ject's name on the reverse side. The word "Florida" appeared on the front of the pictures of Bryan, Ballard and Neal.

Subsequently, on July 8, 1968, Special Agent Ralph Liewer of the F.B.I. also interviewed Wilson and Bing in Collierville. He did not know of the earlier visit by Rabideau.[3] Liewer showed eight pictures to Wilson and Bing, separately. Except for pictures of Ballard, Neal and one picture of Bryan, the pictures shown by Liewer were completely different from those shown by Rabideau. Liewer covered all identifying data on each picture, laid them on the back seat of his car (he did not permit either witness to handle the pictures), and asked Wilson and Bing if they had seen any of the persons pictured before. Liewer did not suggest that any of those pictured should have actually been seen by Wilson and Bing, nor did he mention any names to them. Wilson positively identified Ballard, Bryan and Neal. Bing identified Bryan and Neal positively, and Ballard tentatively.

At the trial of the case, both Wilson and Bing were called and both identified Bryan and Ballard in court as having been in the service station on June 10, 1968. Both also testified they could have identified the defendants without regard to the photograph display interviews of the two F.B.I. agents.

Wilson testified that he had an opportunity to talk to all three men when they were in the station. Their appearance impressed him because they were unshaven, unkempt, and looked as if they had been sleeping in the car. Two of them appeared to have dyed hair. One did not have on a shirt. All had on dark trousers. When asked by Wilson if they worked on the pipeline, they responded that they did not work anywhere. All these circumstances caused Wilson to note their license number and advise the sheriff's office that suspicious looking persons had stopped in the station.[4] The day was bright and sunny, hence there was no question of visibility.

Bing had observed the three from inside the service station—about fifty feet from their car. One did enter the station for a drink of water and passed close to Bing. Bing also noted the clothing of the trio and the fact that one did not have on a shirt. Although he observed them from inside the station through a glass window, his view was not obstructed by advertisements, etc. on the glass, and the glass—although having some dust on it—was relatively clean, having been washed about two weeks previously. At the time these men were in the station they were the only customers, so Bing's attention was not diverted from them.

Appellants contend that the showing of pictures to Wilson and Bing renders their in-court identifications of Bryan and Ballard inadmissible on the grounds that the proceedings had reached an accusatorial stage at the time the photographs were shown and consequently appellants were entitled to counsel and second, on the grounds that the showing of photographs to Wilson and Bing was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. We shall dispose of the question of right to counsel first.[5]

---

3. Rabideau worked out of Oxford, Mississippi, which was subject to supervision by the Jackson, Mississippi office of the F.B.I., while Liewer was supervised by the Memphis office. The testimony of the two agents shows that each office was unaware of the actions taken by the other in the investigation of the Slayden Bank robbery.

4. It should be noted here that the car used for the get-away on June 11 was not the car the appellants were in on June 10. The car found deserted near Slayden had been stolen. The car in which Ballard, Neal and Bryan were traveling on June 10 belonged to Bryan and had Florida license plates. It was, presumably, the car in which the appellants traveled from Florida to Mississippi and returned.

5. No issue concerning the application of 18 U.S.C.A. § 3502 (1969) is present in this case. This section reads as follows:
"The testimony of a witness that he saw the accused commit or participate in the commission of the crime for which the accused is being tried shall

■ Appellants ask us to extend the right to counsel at a line-up, which the Supreme Court held to exist in United States v. Wade [6] and Gilbert v. California,[7] to the circumstances in the case at bar involving an out-of-court identification by use of photographs. In support of their argument that they were entitled to counsel and that such counsel was entitled to be present at the time the F.B.I. agents presented the photographs to the witnesses, Wilson and Bing, the appellants direct our attention to Simmons v. United States.[8] Appellants' reliance is misplaced, for although Simmons is undoubtedly one of the progeny sired by Wade and Gilbert, it is not a right to counsel case. The issue of right to counsel was not raised in Simmons, and Simmons clearly did not extend the right to counsel to an out-of-court photographic identification conducted out of the presence of the accused.

This Circuit has not previously expressly decided the issue presented here,[8A] but the Tenth Circuit in McGee v. United States [9] held that Wade did not apply to an out-of-court photographic identification because there was no line-up identification involved and there was no form of confrontation of the accused. The Tenth Circuit reaffirmed its holding in McGee in Rech v. United States.[10]

The Seventh Circuit, in United States v. Robinson,[11] likewise rejected a contention that the accused had the right to have counsel present under circumstances similar to those in the case at bar.

In United States v. Marson [12] the Fourth Circuit was faced with a similar contention concerning right to counsel, but since the photographic identification complained of had occurred prior to June 12, 1967, that Circuit held that Wade and Gilbert could not have applied [13] even if it were to be accepted that photographic identification was to be equated in all respects with a line up.[14]

In United States v. Bennett,[15] the Second Circuit came to grips with the contention that Wade should be extended to require the presence of counsel at an out-of-court photographic identification.

be admissible in evidence in a criminal prosecution in any trial court ordained and established under Article III of the Constitution of the United States."
Wilson and Bing were not offered as eye witnesses to the *commission* of the crime but rather, were offered to prove the presence of Bryan and Ballard in the vicinity about the time the robbery occurred.

6. 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

7. 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967).

8. 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

8A. In United States v. Venere, 416 F.2d 144 (5th Cir. 1969) and Harris v. Dees, 421 F.2d 1079 (5th Cir. 1970) we held that substantially contemporaneous identification of a suspect by his victim without the formalities of a line-up did not violate the accused's Fifth Amendment rights. Venere and his co-defendant were brought to their confrontation by private citizens who were employed by the victim of their crime. The Court there reasoned that no right to counsel issue, a la Wade, was presented in such a non-police context.

The Harris confrontation occurred before June 12, 1967 and for that reason, Wade was held to be inapplicable. Also, in United States v. Hughes, 418 F.2d 1222 (5th Cir. 1969) we held that an in-court identification which followed an out-of-court picture spread was not so tainted as to require exclusion of the evidence, but Hughes did not undertake to determine if Wade had any application to the issue we here discuss—the necessity for counsel at an out-of-court photographic identification.

9. 402 F.2d 434 (10th Cir. 1968), cert. den. 394 U.S. 908, 89 S.Ct. 1020, 22 L.Ed.2d 220 (1969).

10. 410 F.2d 1131 (10th Cir. 1969).

11. 406 F.2d 64 (7th Cir. 1969).

12. 408 F.2d 644 (4th Cir. 1968).

13. See Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

14. The dissenting opinion of Circuit Judge Winter in Marson disagrees with the right to counsel aspect of the majority opinion. Judge Winter would extend Wade and Gilbert to photographic identification cases without hesitation.

15. 409 F.2d 888 (2d Cir. 1969).

The court, speaking through Judge Friendly, held that *Simmons* was distinguishable because in *Simmons* the accused had not been taken into custody at the time of the photographic identification, whereas in *Bennett*, as here, the accused had been taken into custody. After thus bringing the facts in *Bennett* more nearly within the ambit of *Wade*, Judge Friendly proceeded to explain why the Sixth Amendment did not apply to a photographic identification regardless of whether the accused was in custody, as follows:

"[T]o require that defense counsel be allowed or appointed to attend out-of-court proceedings where the defendant himself is not present would press the Sixth Amendment beyond any previous boundary. None of the classical analyses of the assistance to be given by counsel, Justice Sutherland's in Powell v. Alabama, 287 U.S. 45, 68–69, 53 S.Ct. 55, 77 L.Ed. 158 (1932), and Justice Black's in Johnson v. Zerbst, *supra*, 304 U.S. at 462–463, 58 S.Ct. 1019, 82 L.Ed. 1461 and Gideon v. Wainwright, *supra*, 372 U.S. at 344–345, 83 S.Ct. 792, 9 L.Ed.2d 799, suggests that counsel must be present when the prosecution is interrogating witnesses in the defendant's absence even when, as here, the defendant is under arrest; counsel is rather to be provided to prevent the defendant himself from falling into traps devised by a lawyer on the other side and to see to it that all available defenses are proffered. Many other aspects of the prosecution's interviews with a victim or a witness to a crime afford just as much opportunity for undue suggestion as the display of photographs; so, too, do the defense's interviews notably with alibi witnesses.[16]

We follow our brethren of the Second, Seventh and Tenth Circuits in holding that *Gilbert* and *Wade*—neither through *Simmons* nor outside *Simmons*—require the counsel for an accused be present at the time of any out-of-court photographic identification, regardless of whether the accused is in custody or not.

Actually the point raised in *Simmons* deals with the application of the Fifth Amendment guaranty of due process vis-a-vis photographic identification. As Mr. Justice Harlan stated in *Simmons*, "This is a claim which must be evaluated in light of the totality of surrounding circumstances." [17]

In *Simmons*, the Court acknowledged that there was a potential danger in photographic identifications that the identifier might misidentify the accused, but the Court held that the benefits and advantages of the photographic process of identification outweighed the possible dangers inherent in it. The Court said in part:

"Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eye witnesses to exonerate them through scrutiny of photographs. The danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error. We are unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement." [18]

Continuing, the Court established the standard which must be applied to out-of-court photographic identifications. The Court held:

"[We] hold that each case must be considered on its own facts, and that convictions based on eyewitness iden-

16. Id. at 899–900.

17. 390 U.S. at 383, 88 S.Ct. at 970, 19 L.Ed.2d 1247.

18. 390 U.S. at 384.

tification at trial following a pre-trial identification by photograph will be set aside on that ground only if the photographic identification procedure was *so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.*" [19]  (Emphasis supplied)

■ We are therefore faced with the problem of determining if the photographic identification prior to the trial was so "impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." We hold that it was not. Both Bing and Wilson had ample opportunity to clearly observe both Bryan and Ballard in broad daylight. The first group of photographs were displayed only 19 days after the bank robbery. The two witnesses observed the photographs separately on both occasions without any suggestion by either agent that any person or persons in either group was under suspicion or that any suspects' photograph actually appeared in either group. The fact that Special Agent Rabideau permitted Wilson and Bing to handle the photographs is not significant.[20] The identifying data which appeared on the back of some of the pictures could hardly have been more useful to the witnesses than the pictures themselves. Furthermore, both witnesses were certain that they could have identified both Bryan and Ballard at the trial even if they had never seen photographs of them before. The two photographic identifications occurred three and four weeks, respectively, after the date on which Bryan and Ballard were supposed to have been in the service station. The passage of this brief period of time was not sufficient to raise a pre-sumption that the memories of Bing and Wilson had become clouded by the passage of time.[21]

The pictures of Bryan, Ballard and Neal had the word "Florida" on the front, but this was merely part of identifying data which appeared on most of the pictures giving such information as the place and date where the picture was taken. We do not think that such was impermissibly suggestive—even though Wilson had reported the car in which he claimed Bryan and Ballard were riding, and it had a Florida license plate. All but four of the pictures in the first group shown Bing and Wilson had some similar identifying data on them, and all eight of the pictures in the second group had such identifying data. The absence of such information, since it was present on most of the pictures, would have been equally as suggestive.[22] Nor do we think that the fact that two pictures of Bryan were contained in the first group of pictures shown is impermissibly suggestive.[23]

The only rather novel point presented on the question of whether the photographic identification was impermissibly suggestive is that Wilson and Bing went through two such identifications. So the provocative question here for determination is whether the two pre-trial photographic identifications, neither of which was carried out in a way which was in itself "impermissibly suggestive", reinforce each other in a way to become "impermissibly suggestive" by the mere fact of repetition. We do not think so. As stated, both Wilson and Bing testified under oath that they could have made their in-court identifications even without the photograph displays which had

19. 390 U.S. at 384.

20. See Laughlin v. United States, 411 F.2d 1224 (9th Cir. 1969).

21. See Rech v. United States, supra, n. 10; and United States v. Marson, supra, n. 12.

22. United States v. Butler, 405 F.2d 395 (4th Cir. 1968).

23. Later in the trial Bryan took the stand in his own behalf and admitted that he had been in Collierville, Tennessee on June 10, 1968. This is the sole fact which the photographic and in-court identifications sought to prove. Even if we were to hold, which we do not, that there had been some error because the showing of the photographs was impermissibly suggestive, Bryan's admission would have effectively waived the point.

taken place approximately five months before. The actual in-court identification is the crux of the matter. The essential fact was whether Wilson and Bing could identify Bryan and Ballard in the courtroom as two of the men who came to the service station on June 10. The duplicate exhibition of photographs on July 1 and July 8 has little likelihood of affecting their December personal identifications. Our conclusion is also supported by the fact that the results of the two separate July identifications differed. Therefore in the "totality of surrounding circumstances" we do not believe that there was anything "impermissibly suggestive" about the photographic identifications as conducted in this case.

### III.   EVIDENCE OF ESCAPE.

■ The record shows that while they were incarcerated in the Lafayette County jail in Oxford, Mississippi awaiting trial on the charges of robbing a federally insured bank, both Bryan and Ballard escaped from custody. The District Court permitted evidence of the escape to be introduced to show a consciousness of guilt on the part of Bryan and Ballard. Although both Bryan and Ballard contended this was error, we see no reason for departing from the universally accepted rule that evidence of flight is admissible to prove a consciousness of guilt. As stated in Wigmore, Evidence, § 276 (3d ed. 1940), "it is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself. * * * " The District Judge was not in error in admitting such evidence of escape.

### IV.   THE DROPPING OF PERJURY CHARGES AGAINST A WITNESS SUBSEQUENT TO TRIAL.

■ The record shows that while they plies only to Ballard. Homer Leon Mur-ray, Ballard's stepbrother, was first interviewed in Florida on June 20, 1968 by special agents of the F.B.I. At that time he stated to the F.B.I. that Ballard had admitted to him that he, Ballard, had participated in the bank robbery in Slayden, Mississippi. Subsequently, at a removal hearing held in Florida on July 2, 1968, Murray repudiated his previous story and denied that Ballard had admitted participating in the bank robbery. Murray was then arrested on a charge of perjury. After he had been in jail three days, he requested, through his wife, that F.B.I. agents interview him again. At the second interview, he gave a signed statement to agents of the F.B.I. admitting that he had perjured himself at the removal hearing and reaffirming the first story he had told that Ballard had admitted participating in the Slayden bank robbery.

Murray was called as a witness for the prosecution at the trial of this case and testified that Ballard had admitted participation in the bank robbery to him. On cross-examination Murray admitted that he was then under a charge of perjury for the change in his story in Florida, and counsel argued the possible effect of this perjury charge on Murray's testimony to the jury in his closing argument. During the trial, Ballard's counsel moved to strike the testimony of Murray and moved for a mistrial, and the court overruled both motions. After Ballard's trial and conviction the perjury charges pending against Murray were dropped.

Ballard would have us now infer that because the charges against Murray were dropped soon after Murray testified against Ballard, there was some sort of agreement between the government and Murray that these charges would be dropped if Murray's testimony against Ballard was favorable to the government. There is absolutely nothing in the record to support this contention. Ballard cites us to Napue v. Illinois,[24] but we do not find *Napue* to be in point here. In

24.   360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 217 (1959).

*Napue*, it was established that the State had deliberately participated in misleading the jury when one of the prosecution witnesses was examined concerning any "deals" which he might have made in exchange for his testimony. As indicated in *Napue*, such a deal does not call for the exclusion of the testimony, but rather the defendant is entitled to a full disclosure of all the facts concerning the deal before the jury. The Court said in part:

> "Had the jury been apprised of the true facts, however, it might well have concluded that Hamer had fabricated testimony in order to curry the favor of the very representative of the State who was prosecuting the case in which Hamer was testifying, for Hamer might have believed that such a representative was in a position to implement (as he ultimately attempted to do) any promise of consideration." [25]

We are in accord with the rationale and rule expressed by the Ninth Circuit in Barnard v. United States: [26]

> "We do not agree that the Deegan testimony should be excluded. Every exclusionary rule, while it may be a barrier to deception in one case, may be a barrier to truth in another. We are reluctant to create a new one. Competent counsel, with a full story of the government's treatment of the Deegans before the jury, may well be able to convince the jury that they should not be believed. This opportunity, we think, is all that Weinstein [the defendant] is entitled to." [27]

In the case at bar, there was a full disclosure of the circumstances surrounding the perjury charges against Murray, and there was not only a full opportunity to go into these matters but they were in fact pursued in some detail. We do not think that Ballard was entitled to more.

## V. LACK OF EFFECTIVE COUNSEL FOR BRYAN.

On this appeal, Bryan contends that his trial counsel was not competent to defend him effectively. He suggests that had there been a probing in chambers there may have been circumstances brought to light which made the initial search of Bryan illegal; he points out that fingerprint evidence was admitted without objection; he observes that there was no motion made for a severance; he points out the admission of certain testimony without objection. We have carefully examined the record and in our opinion, Bryan was ably represented by counsel at his trial as he most certainly was on this appeal. As we recently said in United States v. Long: [28]

> "Appellant contends that the fact that trial counsel failed to object to testimony except in one instance, failed to summon character witnesses to support him and moved for a verdict of acquittal only upon being 'reminded' by the Court, establishes lack of effective assistance. A review of the record simply does not bear this out. *In almost any case a hindsight combing of the record will reveal possible alternatives in trial tactics. For this reason the rule is well established that counsel's actions or omissions must be of such a nature as to render the trial a farce and a mockery of justice which shocks the conscience of the court.* Odom v. United States, 377 F.2d 853, 858–859 (5th Cir. 1967). Appellant's allegations are insufficient to point to anything more than tactical decisions of counsel and do not support a claim of ineffectual assistance.[29] (Emphasis supplied)

Nothing in the present record indicates that Bryan's trial was a farce or a

---

25. 360 U.S. at 270.

26. 342 F.2d 309 (9th Cir. 1965); cert. den. 382 U.S. 948, 86 S.Ct. 403, 15 L.Ed. 2d 356 (1965); reh. den. 382 U.S. 1002, 86 S.Ct. 567, 15 L.Ed.2d 491 (1966).

27. 342 F.2d at 320.

28. 419 F.2d 91 (5th Cir. 1969). 3, 1969].

29. *Id.* at p. 93.

mockery of justice. Our conscience is far from shocked. His trial was fair and his trial counsel was effective, though not victorious. We therefore conclude that his appeal on this point fails also.

Affirmed.