**Richard Florentino TAFOYA, aka Robert Peralta Herrera, Petitioner,**

**v.**

**Frank A. EYMAN, Superintendent, Arizona State Prison, Respondent.**

**No. Civ.–70–142.**

United States District Court,
D. Arizona.

July 23, 1970.

Edwin F. Hendricks, Snell & Wilmer, Phoenix, Ariz., for petitioner.

William P. Dixon, Asst. Atty. Gen., State of Arizona, Phoenix, Ariz., for respondent.

## ORDER

CRAIG, District Judge.

Petitioner is presently serving a sentence of eight to ten years for the robbery of a Greyhound Bus Company of Tucson, Arizona. Sentence was imposed by the Superior Court of Pima County, Arizona, after a trial by jury at which petitioner was represented by counsel.

Petitioner has exhausted his available state remedies in that the issues set forth below were raised on appeal to the Supreme Court of Arizona. State v. Tafoya, 104 Ariz. 400, 454 P.2d 145 (1969). The conviction was affirmed. Petitioner now seeks relief by way of a writ of habeas corpus. Leave to file the petition in forma pauperis has previously been granted.

The record indicates the following facts:

On the evening of February 17, 1967, the Greyhound Bus depot in Tucson was robbed by a gunman wearing no mask or disguise. The immediate victim was James Adams, the ticket seller at the depot. Adams was positioned behind the cashier's window. On his left was standing a co-employee, Jill Barnes, whose working area was adjacent to Adams'. Adams and Barnes had been conversing for several minutes with Julie Pedro, who was standing on the other side of the cashier's window facing

Adams and Barnes. While they had been engaged in conversation, Miss Pedro had noticed a man standing on her right side and staring at her for about four to five minutes. The man then roamed around to the left side of Pedro where she next noticed him standing by a change machine. He turned around at the change machine, looked about, and then approached the cashier's window from Pedro's left side. She looked at him again as he walked up to her. The man grabbed her around the waist with his right arm and thrust a gun into her ribs with his left hand. He demanded that Adams hand over the money. At first, Adams did not respond by complying with the demand. Then Adams and Barnes saw the gun, whereupon Adams asked the gunman if he wanted a bag for the money. The man said no and made a second demand for the money. Adams commenced to slowly remove the money from the cash drawer and lay it on the counter beginning with the loose paper currency, followed by packs of one dollar bills and finally rolls of coins. During this time the gunman made two more demands for Adams to hurry up and give him all the money. These demands were apparently precipitated by Adams' claim, after each segment of the cash drawer was produced, that the man had been given all the money.

The gunman picked up the paper money and stuffed it in his pocket. He grabbed Pedro with the gun still pointed at her and backed out toward the front door of the depot, threatening that if anyone made a move he would shoot Pedro. As he was backing out, he was facing Adams, Barnes and to some extent Pedro. When he got to the door he released the girl, stepped outside, and disappeared with another man who had been waiting outside.

During this entire encounter, Adams testified that he was consciously taking his time in handing over the money in an attempt to get a description of the robber. Adams estimated that he saw the robber across the counter for approx-imately three and a half minutes. Barnes, from her vantage point immediately adjacent to Adams, witnessed the entire series of events until just moments before the gunman stepped out the front door. Miss Pedro observed the gunman before the actual robbery commenced and viewed no less than his profile during the time she was held as hostage.

While the above described events were taking place, two twenty-year old girls who were waiting together in the depot —Marie Ambrose and Rose Marie Antone—observed the gunman for several minutes before the robbery commenced. Miss Ambrose first saw the man standing by the window. Then she observed him drinking from the fountain. From the fountain he passed by the two girls and stood to the right side of them. She then watched as he moved over towards Pedro, grabbed her and brandished his pistol. She finally saw the man back towards the door with Miss Pedro and depart.

Miss Antone first noticed the robber as he was standing by the water fountain. She then observed him as he moved to the right side of the ticket counter. She noted that he remained there quite a while before he moved over to the other side of the counter. Next he was watched by her as he grabbed Miss Pedro, pulled out the gun, and pointed it at Adams. Miss Antone did not observe the money change hands but she did see the gunman move towards the door with Miss Pedro and then depart.

All five witnesses, Adams, Barnes, Pedro, Ambrose and Antone, made oral statements to the police that night. Adams and Barnes gave detailed descriptions to the police and together assisted a police artist in making up a composite drawing of the gunman.

A few days after the robbery Adams and Barnes were approached separately by a police detective and shown 100 to 150 photographs. Petitioner's photograph was not included in that group

of pictures. The series of photos contained diverse racial types of which approximately 25% were young Mexican-American males. Neither witness could identify any of the pictures as being that of the man who robbed the bus station.

About three months, later, in May of 1967, after the defendant was confined at the state prison on another charge, Adams and Barnes were again asked to view photographs. This time they viewed the photos in each other's presence. They were shown only "four to five" pictures of young Mexican-American males and two of the pictures were of the petitioner. The photos were laid out in a line in front of the witnesses. They were asked by the detective whether they could identify any of the men as the robber. After viewing the photos for a very short period of time, the witnesses simultaneously identified petitioner's picture from the four to five pictures as the man that had pulled the holdup in question.

On September 26, 1967, after an information had been filed charging petitioner with this robbery, he was brought into a Tucson courtroom for arraignment. A Tucson police officer took Adams and Barnes to the same courtroom for the express purpose of determining whether or not there was anyone in the courtroom whom they could identify. They were not told that the man who robbed the bus station would be in the courtroom. They did not know that they were attending an arraignment nor was the nature of an arraignment proceeding explained to them. They were merely asked to observe whether there was anybody in the courtroom they could identify. The whole matter took about fifteen minutes.

"Prior to the opening of court, defendant and ten other prisoners were seated in the jury box. All were in handcuffs. There was a score of other persons in the room—lawyers, court employees, other accuseds, etc. Defendant was the only one wearing blue prison clothes, but not the only one in a blue suit. Adams and Mrs. Barnes were told to go in, sit down, observe everyone in the room, not speak to each other, and not give any outward sign if they recognized the robber. Officer Wilhelm, who accompanied the witnesses, did not himself know which person in the courtroom was the robber. Adams left the room with officer Wilhelm and, in the hall, told him that defendant was the man who committed the holdup. The officer then got Mrs. Barnes out of the courtroom and she made the same identification without any help from Adams. Mr. John S. O'Dowd, an attorney, was in the courtroom while these events were taking place but he had not yet been appointed to represent defendant and was not aware of the fact that an identification was being made. He did not learn these facts until they were elicited from the witnesses by the County Attorney at defendant's trial in this case." State v. Tafoya, 104 Ariz. at 401, 454 P.2d at 146.

The other three eyewitnesses to the robbery, Julie Pedro, Marie Ambrose, and Rose Marie Antone, made no subsequent identification of the robber until shortly before their appearance at trial. The day before trial, these witnesses were brought to Tucson. On the morning of the first day of trial, and while in each other's presence, the witnesses were shown three photographs by the prosecuting attorney, two of which were of the petitioner. All three of the witnesses identified petitioner from the photos. Subsequently, the three girls were taken together into the courtroom on the first day of petitioner's trial and, without the knowledge of petitioner or his attorney, viewed the proceedings for several minutes.

At trial Adams and Barnes made in-court identifications of petitioner as the man who robbed the bus depot. Moreover, both witnesses testified over objection at trial that they had previously identified petitioner from photos and at the above mentioned "post-

information show-up." This testimony was brought out both on direct and cross-examination. The testimony of Adams and Barnes was confirmed by the police officer who escorted them to petitioner's arraignment. He testified as to the identification of petitioner by Adams and Barnes at the arraignment.

Julie Pedro, Marie Ambrose, and Rose Marie Antone each identified petitioner at trial as the man who committed the robbery in question. On cross-examination were elicited the circumstances surrounding their photo identification and visual identification of petitioner the day before they testified.

The conviction of petitioner was obtained entirely as a result of the above mentioned eye-witness testimony.

On appeal, the Arizona Supreme Court held that the trial court did not commit reversible error by admitting in evidence the testimony of Adams and Barnes that they had previously identified petitioner at a post-information showup at which his attorney was not present. This holding was the result of a finding by the Arizona Supreme Court that a showup preceded by a photographic identification is not a "critical stage" of the prosecution within the meaning of United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); and Gilbert v. State of California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). The Arizona Supreme Court further held that the admission of the showup result was harmless beyond a reasonable doubt. State v. Tafoya, *supra.*

Petitioner makes the following contentions in his present habeas corpus petition:

(1) The identification of petitioner by Adams and Barnes at the post-information showup in the absence of counsel was contrary to petitioner's Sixth and Fourteenth Amendment right to counsel as stated in United States v. Wade, *supra,* and therefore, this violation could not have been absolved by a finding that *ad hoc* photographic procedures, themselves highly and unnecessarily suggestive, converted the lineup into a "noncritical state."

(2) It cannot reasonably be said that there existed an independent basis for the in-court identifications of petitioner by Adams and Barnes, nor can it seriously be contended that this crucial identification testimony beyond a reasonable doubt could not have contributed to the conviction.

(3) The testimony regarding the result of the illegal lineup identification was *per se* inadmissible under Gilbert v. State of California, *supra,* and could not be said to be harmless beyond a reasonable doubt, asserting the fact that the other evidence relied upon by the state was tainted by unconstitutional procedures.

I

There exists in the record "clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identification." United States v. Wade, *supra,* 388 U.S. at 240, 87 S.Ct. at 1939. This Court reaches this conclusion from an application of the Supreme Court's test as set forth in *Wade:*

"We think it follows that the proper test to be applied in these situations is that quoted in Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, ' "[W]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Maguire, Evidence of Guilt, 221 (1959).' See also Hoffa v. United States, 385 U.S. 293, 309, 87 S.Ct. 408, 17 L.Ed.2d 374. Application of this test in the present context requires consideration of various factors; for example, the prior opportunity to observe the alleged criminal act, the existence of any discrepancy

between any pre-lineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification. It is also relevant to consider those facts which, despite the absence of counsel, are disclosed concerning the conduct of the lineup." 388 U.S. at 241, 87 S.Ct. at 1939.

All five eye witnesses had excellent opportunities to clearly observe the man who robbed the bus depot. Observations of the robber were made by each witness over a span of several minutes. Adams testified he was making a concerted effort to note the identifying characteristics of the holdup man.[1]

■ The second photo showing, at which petitioner was identified simultaneously by Adams and Barnes was not "so impressively suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). Each case must be considered on its own facts. It "must be evaluated in light of the totality of the surrounding circumstances."

■ The fact that two pictures of petitioner were included in the second photo display, does not, of itself, constitute impermissible suggestion. *See* United States v. Cunningham, 423 F.2d 1269 (4th Cir. 1970); United States v. Ballard, 423 F.2d 127 (5th Cir. 1970); United States v. Baker, 419 F.2d 83, 89 (2d Cir. 1969); United States v. Butler, 405 F.2d 395 (4th Cir. 1968), cert. den. 396 U.S. 853, 90 S.Ct. 114, 24 L.Ed.2d 102; and United States v. Hutto, 393 F.2d 783, 784 (4th Cir. 1968).

■ Petitioner further contends that *Simmons', supra,* condonation of photographic identification techniques should be limited to identifying at-large suspects. When a suspect is in custody, it is argued, a reliable corporeal identification (presumably in the presence of counsel) can be held. The requirement of the presence of counsel at out-of-court photograph identifications where the suspect is no longer at large, is not required by the reasoning of *Wade, Gilbert* or *Simmons,* supra. United States v. Ballard, *supra;* McGee v. United States, 402 F.2d 434 (10th Cir. 1968), cert. den. 394 U.S. 908, 89 S.Ct. 1020, 22 L.Ed.2d 220 (1969); United States v. Robinson, 406 F.2d 64 (7th Cir. 1969), cert. den. 395 U.S. 926, 89 S.Ct. 1783, 23 L.Ed.2d 243; and United States v. Bennett, 409 F.2d 888 (2d Cir. 1969), cert. den. Jessup v. United States, 396 U.S. 852, 90 S.Ct. 117, 24 L.Ed.2d 101.

This Court concludes that the record as a whole indicates clearly and convincingly that these in-court identifications had a source independent from the challenged lineup.

## II

■ In Gilbert v. State of California, *supra,* the Supreme Court held that the admission of testimony of witnesses that they identified the defendant at a lineup held in violation of the principles announced in *Wade, supra,* constituted *per se* reversible error unless the reviewing court is " 'able to declare a belief that it was harmless beyond a reasonable doubt,' Chapman v. State of California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705." 388 U.S. at 274, 87 S.Ct. at 1957. Petitioner con-

---

1. *See* United States ex rel. Rutherford v. Deegan, 406 F.2d 217 (2d Cir. 1969), cert. den. 395 U.S. 983, 89 S.Ct. 2145, 23 L.Ed.2d 771, where the court held that the "totality of the circumstances" surrounding a single person showup justified a finding that there was no likelihood of irreparable misidentification. One of the key circumstances considered by the court was the fact that the robbery victim testified that she made a deliberate attempt to study the face of the man who pulled the holdup.

tends that the testimony of Adams, Barnes and the Tucson police officer concerning the identification of petitioner at the lineup falls within the *per se* exclusionary rule of *Gilbert, supra.*

■ The Arizona Supreme Court, although finding the lineup not to have been in violation of *Wade* and *Gilbert, supra,* held in the alternative "that the admission of the showup result was harmless beyond a reasonable doubt." State v. Tafoya, *supra,* 104 Ariz. at 404, 454 P.2d at 149. This Court finds by virtue of its own independent examination of the record that the admission of the testimony concerning the identification of petitioner at the Tucson arraignment was harmless beyond a reasonable doubt.

■ Petitioner contends that a conclusion of harmless error cannot be reached because the other testimony in the case was unconstitutionally tainted in that (1) the in-court identification by Adams and Barnes was infected by the challenged lineup and (2) the testimony of the other three identifying witnesses, Pedro, Ambrose and Antone, was infected by impermissible photographic and corporeal identifications. The result reached in Part I, *supra,* holding that the in-court identifications by Adams and Barnes were not tainted by the lineup, eliminates the first basis for petitioner's contention. As to the second basis, this Court holds that the testimony of Pedro, Ambrose and Antone was not impermissibly tainted. Each of the latter three witnesses had excellent opportunities to observe the man who committed the holdup. This is particularly true of Miss Pedro, who noticed the robber as he stared at her, as he moved about the depot, and as he held her hostage during the commission of the crime. Each of the three girls gave the police a description of the suspect the night of the robbery. Each made an unequivocal, positive, in-court identification of petitioner at trial.

There is massive evidence to support the conviction without the testimony pertaining specifically either to the challenged lineup at petitioner's arraignment or to the identification testimony of the other three eye witnesses. The untainted testimony of Adams and Barnes comprised the bulk of the trial and was clearly sufficient to make the case against petitioner. The testimony of the other three eye witnesses was cumulative and redundant in nature and constituted only a small part of the testimony in this case.

### III

■ Finally, petitioner contends that the Arizona Supreme Court's finding of harmless error as to the testimony pertaining to the challenged lineup was erroneously based on the *reliability* of the identification rather than the *effect* of the testimony upon the jury. However, the reliability of the identification is not rationally independent of the possible effect of tainted testimony on the jury. The stronger is the testimony pertaining to the reliability of the identification of the perpetrator of the crime the less likely that constitutionally impermissible testimony will influence the jury in reaching its verdict. This Court is of the opinion that the untainted evidence identifying petitioner as the perpetrator of the robbery in question is so clear and convincing that the testimony concerning his identification at the Tucson arraignment-lineup could not have possibly influenced the jury in reaching its verdict.

It is ordered that the petition for writ of habeas corpus is denied.