# Bowles *v.* The State.

### *Indictment for Murder.*

1. *Flight, and attempts to evade justice, proof of; relevancy and effect of.*
All evasions or attempts to evade justice by a person suspected or charged
with crime, are circumstances from which guilt may be inferred, if connected
with other criminating facts; and though not of themselves warranting a con-
viction, they are relevant evidence, it being the province of the jury, to
determine their weight, in view of all the facts and circumstances of the case,
under appropriate instructions from the court.

*Same.*—Flight, for which no proper motive can be assigned, and remaining
unexplained, is a circumstance proper to be submitted to the jury, in connec-
tion with other criminating evidence against the accused; and where he fled
after the commission of the offense, the State may introduce a requisition upon
the governor of a sister State, to show how he was arrested.

3. *Bad character of deceased; when immaterial.*—Proof of the bad character
of the deceased for turbulence and violence can not be received, when there
was no act or conduct of the deceased, at the time of the killing, which can be
illustrated by such bad character, or when there is no evidence tending to
show that the killing was in self-defense; and charges based on such bad
character, in such a case, are properly refused.

4. *Negligence of wounded man or nurses; when immaterial.*—Where death
is caused by a dangerous wound, the person inflicting it is responsible
for the consequences, though the deceased might have recovered with the
exercise of more prudence and with better nurses; and a charge is properly
refused which instructs the jury, without regard to the character of the wound,
that the prisoner can not be convicted of murder, although the wound was
inflicted with malice aforethought, pursuant to a formed design to kill, &c., if
the wounded person died from the gross carelessness of himself or nurses.

APPEAL from City Court of Mobile.

Tried before Hon. O. J. SEMMES.

The appellant, Bowles, was convicted of the murder of
Albert Smith, and sentenced to imprisonment in the peni-
tentiary for life.

The evidence shows that Bowles lived some seven miles
from the city of Mobile, and on the morning of the shooting,
the deceased and one or two other persons passed by the
house in which appellant, Bowles, lived, on their way to
Mobile, as one of these persons had promised to call Bowles
as they went by. On the return of the party from Mobile,
as they got near the house, the deceased being in the road,
some few feet from the gallery of the house, Bowles came
out on the gallery, and, addressing the party, asked: "Why
did'nt you holler this morning?" Deceased asked who he was
talking to, and Bowles replied "as soon to you as any other
man." Deceased replied, "come out here and I will talk to
you." Bowles said, "I'll come out and shoot you too," and

he then came out to where deceased was, drawing a pistol as he came, and when within three feet of deceased presented the pistol. One of the party begged him not to shoot, and he lowered his pistol for a few moments, and again raised it and fired on deceased, who was leaning on a small stick, which he always used to assist in walking, as he was lame in one leg. The deceased was unarmed and had made no motion or attempt to use his stick or other weapon. One of the witnesses caught hold of the prisoner, and remarked that he had killed the man for nothing, but prisoner shook witness off, saying that he would shoot him or any other man when he was mad. Smith fell soon after he was shot, and Bowles fled. One witness testified that "about two weeks before the shooting, deceased and Bowles had some words at a timber camp, Smith coming into camp, and Bowles right after him; that Smith said, to one of the men, the boss (meaning Bowles) is pretty hot this evening, and, continuing his remarks, said 'I'll make him hotter than he is before I leave camp.' Bowles came up and asked what he said, and Smith replied 'nothing to you, sir.' Bowles then cursed Smith, and the latter replied, 'we will settle this some other time.' Just before this Bowles had discharged Smith for disobeying instructions about cutting logs."

Dr. Grace, the physician who visited Smith the morning after the shooting, testified, he called for three consecutive days afterwards, and found the patient improving so rapidly that he thought it unnecessary to visit him again. He, therefore, discharged his patient, enjoining upon him and his attendants, the absolute necessity for his remaining in the house, where he was, and refraining from eating any solid food. The witness testified that "the ball entered the left breast, just below the sternum, and ranged backward and outward, through the lower lobe of the lung; that he (witness) did not regard the wound as necessarily dangerous, but feared pneumonia might set in. Two weeks after this, witness was sent for to see Smith at his own house, some twelve miles distant from the house into which he was taken when first shot, and being satisfied from the information given him that the patient would die before he could reach him, did not go." Witness was satisfied from the symptoms detailed to him that Smith died of pneumonia. Dr. Scales, who heard Dr. Grace's testimony as to the wound, testified that "if the wound was on the left side of the sternum, and just below, the ball would cut the diaphram, the liver and the lung;" that a ball taking that course would be likely to produce pneumonia, which is very dangerous when superinduced by a wound in the lung; that such a wound could not

[Bowles v. The State.]

be declared mortal or necessarily dangerous, or otherwise, within three days after it was inflicted.

Five or six days after receiving the wound, Smith ate roasted sweet-potatoes, and with some assistance walked to a wagon which had been sent for him, and rode over a rough country-road to his home, some twelve miles distant, where he died some twelve days afterwards.

It was proved that the deceased's general reputation was that of a violent and turbulent man, while appellant's general reputation was shown to be that of a quiet, peaceable and law-abiding man.

"The State offered in evidence a requisition from the governor of Alabama on the governor of Mississippi for the arrest of defendant on this charge, and when the defendant objected to its introduction, the court allowed it to go to the jury to the extent of its being the paper, or authority, upon which the defendant was arrested in Mississippi; whereupon defendant objected, and his objection being again overruled, he excepted."

The defendant requested the following charges in writing:

"1. If the deceased was a violent, turbulent man, and had threatened to kill the defendant, or to do him some great bodily harm, just previous to his being shot by the defendant,—and this is a question for the jury—the law justified the defendant in carrying a concealed weapon, and to protect himself with it against the defendant [deceased?] if necessary."

"2. The court charges the jury as a matter of law, that if one is shot, stabbed, or otherwise wounded or injured by another, even though the injury were inflicted after premeditation and with a formed design to kill, and the wounded person should die from the unskillful treatment of the physician, or the gross carelessness of himself or his nurses, the party inflicting the wound or injury could not be convicted of murder."

The court refused both these charges, and the defendant duly and separately excepted.

The admission of the requisition on the governor of Mississippi, and the refusal to give the charges requested, are now assigned as error.

JOHN H. GLENNON, for appellant.—The charges requested, asserted correct legal propositions, arising out of the testimony, and should have been given.—1 Brick. p. 479, § 439; *Pritchett v. The State*, 22 Ala. 39. The requisition on the governor of Mississippi was illegal and irrelevant evidence.

Its only effect was to prejudice the prisoner's defense, by proof of matters not connected with the killing.

JNO. W. A. SANFORD, Attorney-General, *contra.*—The first charge requested was properly refused. The deceased was not doing anything which could be tortured into an attempt to carry out any threat, or do the appellant any bodily harm. The case made by the record has no element of self-defense in it.—*Franklin v. The State,* 29 Ala. 14. The second charge has already been condemned by the court in McAllister's case (17 Ala. 434), and was properly refused.—2 Brick. Crim. Law, § 653. The defendant fled immediately after the shooting. The requisition was admissible to rebut the idea that he had returned voluntarily to stand his trial.

BRICKELL, C. J.—All evasions, or attempts to evade justice, by a person suspected or charged with crime, are circumstances from which a consciousness of guilt may be inferred, if connected with other criminating facts. Of themselves, they may not warrant a conviction, but they are relevant as evidence, and the weight to which they are entitled, it is the province of the jury to determine, under proper instructions from the court.—*People v. Stanley,* 47 Cal. 113; (S. C.); 2 Green's Cr. Rep. 437; Wharton on Homicide, § 710; Burrill on Cir. Ev. § 22, 469. Flight, for which no proper motive can be assigned, and which remains unexplained, is a circumstance all authorities agree it is proper to submit to the jury, in connection with other evidence tending to show the guilt of the accused. In the old common law, the rule which passed into a maxim, was, that flight was equivalent to a confession of guilt: *fatetur facinus qui judicium fugit.* At the present day it is regarded as a mere criminative circumstance, indicative of a consciousness of guilt, and of an attempt to evade justice, which is subject to infirmative considerations that may deprive it of all force. The unfavorable inference against the prisoner would be lessened if he voluntarily returned and surrendered himself to answer the accusation. Whether its force, as a criminative fact, is increased by proof that his return was compulsory under the process of the law, and that the flight was beyond the jurisdiction of the State, it is for the jury to determine. We think it permissible to prove the fact of flight, and all the facts connected with it, either to increase or diminish the probative force of the fact itself. The requisition of the governor for the arrest and surrender of the prisoner, was admitted by the City Court, for the sole purpose of showing the authority

under which he was arrested in Mississippi. For that purpose it was admissible in the view we have taken.

2. There was no error in the refusal of the charges requested by the prisoner.—*Pritchett v. State*, 22 Ala. 39; *Franklin v. State*, 29 Ala. 14; *Eiland v. State*, 52 Ala. 322; *McAllister v. State*, 12 Ala. 434; *Morea v. State*, 2 Ala. 275; *Parsons v. State*, 21 Ala. 300.

We find no error in the record, and the judgment must be affirmed.