728 So.2d 1126 (1998)
Ex parte Andrew Bert CLARK.
(Re Andrew Bert Clark v. State).
1951368.
Supreme Court of Alabama.
May 15, 1998.
*1127 Charles D. Decker, Dothan, for petitioner.
Bill Pryor, atty. gen., and Michael B. Billingsley, asst. atty. gen., for respondent.
COOK, Justice.
We granted Andrew Bert Clark's petition for the writ of certiorari to review his capital murder conviction and his sentence of death by electrocution.

Facts
Clark was convicted of murder made capital pursuant to § 13A-5-40(2), Ala.Code 1975, because the murder occurred during the commission of a first degree robbery. Following a sentencing hearing, the jury, by a 9 to 3 vote, recommended that Clark be sentenced to life imprisonment without parole. The trial judge, pursuant to the authority given him by § 13A-5-47(e), overrode *1128 the jury's recommendation of life without parole and sentenced Clark to death by electrocution. The Court of Criminal Appeals affirmed Clark's conviction and sentence, and, in its opinion, set forth the following facts:
"The state's evidence tended to show that on April 20, 1994, Clark led officers to a field, where they found a shallow grave containing the body of Tom Posey. Dr. Alfredo Paredes, forensic pathologist, testified that he was present when the body was exhumed and that he performed the autopsy. He testified that the body was in fairly good condition because it had been buried in a shaded wet area. The victim had been shot six times with a .22 caliber gun: three shots to the head and three shots to the back. It was Dr. Paredes' opinion that Posey died as a result of the three gunshots to the head, one to the right side of the head, one to the back of the head, and one above the left eye. Clark also took police to a culvert along County Road 87 behind the Dothan Airport, where they found a Ruger .22 caliber semi-automatic rifle.
"The victim's father testified that he last saw Tom Posey on March 17 or March 18, 1994. The victim's father also testified that at the time of Posey's disappearance Clark was living with the victim.
"Clark was apprehended in Bozeman, Montana, in April 1994, for violating a Henry County, Alabama, district judge's release order on an earlier unrelated offense. Officer Lynnwood Stokes of the Headland Police Department went to Montana to escort Clark back to Henry County. When Officer Stokes arrived at the police station in Montana he saw a 1992 Honda Civic automobile with a Henry County license tag parked outside the police station. The car was registered to Tom Posey. A search warrant was obtained to search the car. As a result of the search, numerous credit cards belonging to the victim were recovered as well as the victim's automatic teller machine (ATM) card. Police also discovered military discharge papers belonging to Clark. An investigation by Stokes revealed that the credit cards had been used in New York to purchase a videocassette recorder (VCR) camera and had been used at numerous hotels around the country. Clark had made a videotape of his travels from March to April, which showed him in New York City, Niagara Falls, Ontario, Salt Lake City, and Yellowstone National Park. Stokes also testified that Clark had purchased a Ruger .22 caliber semi-automatic rifle in Dothan, Alabama, on March 18, 1994.
"Officer Stokes testified that when he was escorting Clark to Alabama, Clark inquired as to what he would be charged with when he returned. Stokes told him that he was charged with violating a release order. (The victim had signed the papers authorizing Clark's release on bond.) Clark then inquired about Posey's disappearance and asked if he thought something bad had happened to him. Clark then asked Stokes about the possible punishment for murder and whether he knew of anyone in the Bible who had been forgiven for committing murder.
"When Stokes and Clark arrived at the Headland Police Department, Clark requested to speak with Stokes. Clark then told Stokes that `things' had been bothering him and that he would give the officers `what they wanted.' Clark then got up from his chair and said that he could not sleep until he had led them to Posey's body. He then led them to where Posey was buried. Clark also showed officers where he had shot Posey. Shell casings were found at the spot where Clark had said he had shot Posey.
"Stokes testified that Clark described to him the circumstances surrounding Posey's murder. Clark told Stokes that on March 19, at around 11:00 a.m., he and the victim were parked off Burdeshaw road.... Posey was standing and facing away from the car, and Clark went to the trunk and retrieved a Ruger .22 caliber rifle and shot Posey in the back of the head. Posey then fell to the ground. Clark kept firing until Posey's body was motionless. Clark then approached the body and pointed the gun to the back of Posey's head and fired one more bullet into Posey's head near his ear.

*1129 "Dwight Gamble, vice-president and security officer for the Headland National Bank, testified that the victim, Tom Posey, had a checking account and ATM card with Headland National Bank. He testified that transactions made at the ATM are videotaped. He said that from March 19, 1994, through March 23, 1994, several transactions on Posey's account were made at the ATM and that they were not made by Posey as evidenced by the videotape of the transactions. The first transaction, on March 19, was an inquiry as to the checking account balance. On this date, three attempts were made to withdraw money from Posey's account. The first unsuccessful attempt requested a withdrawal of $580, which was over the $500 daily withdrawal limit; the second request was for $400, which was over the $300 per transaction withdrawal limit; and the third attempt resulted in a withdrawal of $300. Another transaction at the ATM was made on March 23. At this time a balance inquiry was made and $300 was withdrawn from Posey's account. The videotape of the transactions was played to the jury.
"Clark put on witnesses who testified that he had access to the victim's Honda car and that he customarily drove it to deliver pizzas. Clark's sister and mother also testified that he had been abused by his father and that his strict Mormon upbringing had had a drastic psychological effect on him."
Clark v. State, 728 So.2d 1117 (Ala.Cr.App. 1996).
In affirming Clark's conviction and sentence, the Court of Criminal Appeals addressed the following issues: whether the trial judge erred in denying Clark's motion for recusal; whether the trial court erred in refusing to strike a prospective juror for cause; whether the trial court erred in allowing photographs of Posey's body into evidence; whether the trial judge erred in failing to instruct the jury on the lesser included offense of manslaughter; and whether there was sufficient evidence to convict Clark of capital murder. The Court of Criminal Appeals adequately addressed these issues in its opinion and we, therefore, adopt the reasoning and holding of the Court of Criminal Appeals on those issues as part of the opinion of this Court. We will address the following additional issues raised by Clark in this Court.

I.
Clark contends that the prosecutor impermissibly directly and indirectly referred to the fact that Clark did not testify at the trial. Clark argues that during closing arguments the prosecutor made a direct reference to his failure to testify, when the prosecutor told the jury:
"He [defense counsel] says the State wants you to believe some of Posey'sof Clark's statement about Posey, but not all of it. No, no, I do not. He didn't tell the entire truth in his statement. There was no testimony, it was a statement we offered. Okay?"
R.T. at 917. Clark argues that this comment directly referred to his failure to testify at trial and, consequently, was reversible error. The record indicates that the comment made by the prosecutor during closing arguments was made after the following comment made by the defense:
"Ladies and gentlemen, in summation, you have a situation and you have a tape recording of the only surviving witness who was there giving you direct testimony of exactly what happened out there, Andy Clark's statements."
R.T. at 912-13. The defendant did not object at trial to the prosecutor's statement during closing argument. This Court has written:
"We note that defense counsel's failure to object to these comments does not prevent our review. However, the failure to object should be weighed as part of our evaluation of the comments, because the failure to object may suggest that the defense did not consider the comments to be particularly harmful. Ex parte Kennedy, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985)."
Ex parte Payne, 683 So.2d 458, 465 (Ala. 1996).
*1130 In Ex parte Brooks, 695 So.2d 184 (Ala. 1997), this Court wrote:
"In all criminal prosecutions, the accused shall not be compelled to give evidence against himself. Alabama Constitution, Art. I, § 6.
"`On the trial of all indictments, complaints or other criminal proceedings, the person on trial shall, at his own request, but not otherwise, be a competent witness, and his failure to make such a request shall not create any presumption against him nor be the subject of comment by counsel. If the district attorney makes any comment concerning the defendant's failure to testify, a new trial must be granted on motion filed within 30 days from entry of the judgment.'
Ala.Code 1975, § 12-21-220; see also Ex parte Wilson, 571 So.2d 1251, 1261 (Ala. 1990); Ex parte Yarber, 375 So.2d 1231, 1233 (Ala.1979); Whitt v. State, 370 So.2d 736, 738-39 (Ala.1979).
"Comments by a prosecutor on a defendant's failure to testify are highly prejudicial and harmful, and courts must carefully guard against a violation of a defendant's constitutional right not to testify. Whitt, supra, at 739; Ex parte Williams, 461 So.2d 852, 853 (Ala.1984); see Ex parte Purser, 607 So.2d 301 (Ala.1992). This Court has held that comments by a prosecutor that a jury may possibly take as a reference to the defendant's failure to testify violate Art. I, § 6, of the Alabama Constitution of 1901. Ex parte Land, 678 So.2d 224 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996); Ex parte McWilliams, 640 So.2d 1015 (Ala. 1993); Ex parte Wilson, supra; Ex parte Tucker, 454 So.2d 552 (Ala.1984); Beecher v. State 294 Ala. 674, 320 So.2d 727 (1975). Additionally, the Fifth and Fourteenth Amendments of the United States Constitution may be violated if the prosecutor comments upon the accused's silence. Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); Ex parte Land, supra; Ex parte Wilson, supra. Under federal law, a comment is improper if it was `"`manifestly intended or was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'"' United States v. Herring, 955 F.2d 703, 709 (11th Cir.), cert. denied, 506 U.S. 927, 113 S.Ct. 353, 121 L.Ed.2d 267 (1992) (citations omitted); Marsden v. Moore, 847 F.2d 1536, 1547 (11th Cir.), cert. denied, 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 566 (1988); United States v. Betancourt, 734 F.2d 750, 758 (11th Cir.), cert. denied, 469 U.S. 1021, 105 S.Ct. 440, 83 L.Ed.2d 365 (1984). The federal courts characterize comments as either direct or indirect, and, in either case, hold that an improper comment may not always mandate reversal.
"Consistent with this reasoning, Alabama law distinguishes direct comments from indirect comments and establishes that a direct comment on the defendant's failure to testify mandates the reversal of the defendant's conviction, if the trial court failed to promptly cure that comment. Whitt v. State, supra; Ex parte Yarber, supra; Ex parte Williams, supra; Ex parte Wilson, supra. On the other hand, `covert,' or indirect, comments are construed against the defendant, based upon the literal construction of Ala.Code 1975, § 12-21-220, which created the `virtual identification doctrine.' Ex parte Yarber, 375 So.2d at 1234. Thus, in a case in which there has been only an indirect reference to a defendant's failure to testify, in order for the comment to constitute reversible error, there must have been a virtual identification of the defendant as the person who did not become a witness. Ex parte Yarber, 375 So.2d at 1234; Ex parte Williams, supra; Ex parte Wilson, supra; Ex parte Purser, supra. A virtual identification will not exist where the prosecutor's comments were directed toward the fact that the State's evidence was uncontradicted, or had not been denied. See Beecher v. State, 294 Ala. 674, 682, 320 So.2d 727, 734 (1975); Ex parte Williams, supra; Ex parte Purser, supra. Yet, in such circumstances, it becomes important to know whether the defendant alone could have provided the missing evidence.

*1131 "A challenged comment of a prosecutor made during closing arguments must be viewed in the context of the evidence presented in the case and the entire closing arguments made to the juryboth defense counsel's and the prosecutor's. Ex parte Land, supra; Windsor v. State, 683 So.2d 1021, 1023 (Ala.1994); Ex parte Musgrove, 638 So.2d 1360, 1368 (Ala.1993), cert. denied, 513 U.S. 845, 115 S.Ct. 136, 130 L.Ed.2d 78 (1994)."
695 So.2d at 188-89. The statement made by the prosecutor in this case was clearly in response to the earlier comment made by defense counsel. The prosecutor's statement was, in our opinion, an attempt to clarify the type of evidence the State had offered during the trial. While the prosecutor's comment indirectly referred to the fact that the defendant did not take the stand to testify, the statement, "viewed in the context of the evidence presented in the case and the entire closing arguments made to the juryboth defense counsel's and the prosecutor's," did not constitute plain error.
Clark also submits that the prosecutor's statements during the trial that Clark exhibited no remorse were also indirect references to his failure to testify and should mandate a reversal of his conviction. We disagree. The statements, made during closing arguments of the guilt phase of the trial, were as follows:
"Look at his stare right now. Look at him. Now, he looks down. Did you see him during the trial show any type of remorse as you watched him?"
R.T. at 874.
"And then he says he drinks a few beers. And then he goes and buys a shovel once again and goes back. And he goes back and buries Tom. He sticks him in a hole, throws dirt across his friend.
"And then he leaves and goes back again. And then he goes to the mall and buys tapes, buys clothes. And then he goes to Panama City and parties for three or four days. He goes to Le Vela [a nightclub]. He finds himself a girlfriend, has a good old time.
"Any remorse of any kind? None whatsoever."
R.T. at 881. Neither of these comments was objected to; thus, they are subject to review for plain error. See Kuenzel v. State, 577 So.2d 474, 481-82 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
In Harris v. State, 632 So.2d 503, 536 (Ala.Cr.App. 1992), the Court of Criminal Appeals held that a reference to the defendant's lack of remorse during the sentencing stage of the trial was not improper because, it said, the comment
"was a proper inference from the evidence, because testimony had been introduced at trial that the appellant's reaction to being informed of her husband's death was so unemotional that she was questioned concerning her reaction."
Likewise, in Dobyne v. State, 672 So.2d 1319 (Ala.Cr.App.1994), the Court of Criminal Appeals held that a prosecutor's comment, during the sentencing phase of the trial, on the defendant's lack of remorse was a comment "on the appellant's demeanor when he made his statement to police." 672 So.2d at 1349. Although the comments made by the prosecutor in Clark's case were made during the guilt phase of the trial, we find no error. The second comment clearly was a proper inference drawn from the defendant's actions following the murder. The first comment was a reference to the defendant's demeanor. Neither comment constituted plain error.

II.
Clark argues that the trial judge erred by not suppressing statements Clark made to Headland police officer Lynnwood Stokes. Clark contends that he made these statements without having been properly advised of his rights pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). At trial, Stokes testified that he read Clark his rights on April 21, 1994, before taking a taped statement from Clark. Stokes, however, testified that Clark had made incriminating statements to him on April 19 after having been transported from Montana to Headland, Alabama. While Stokes did testify that Clark had been advised of his rights on April 17 by another *1132 officer, Clark contends that Stokes did not set forth the Miranda warnings with sufficient clarity to overcome the presumption of inadmissibility. See Ex parte Johnson, 620 So.2d 709 (Ala.1993), citing Swicegood v. State, 50 Ala.App. 105, 277 So.2d 380 (Ala.Cr. App.1973). Furthermore, Clark argues that the length of time between any Miranda warnings given to him on April 17 in Montana and incriminating statements made by him on April 19, in Alabama, was significant and, therefore, rendered his statements inadmissible.
The statements Clark now challenges were made pursuant to conversations with Lt. Stokes, which were initiated by Clark.
"`Miranda has never been held to apply to statements voluntarily made by defendants. If a defendant spontaneously volunteers information, either before or after being given the Miranda warnings, those statements need not be suppressed.' United States v. Edwards, 885 F.2d 377, 387 (7th Cir.1989). See also Crawford v. State, 479 So.2d 1349, 1352 (Ala.Cr.App. 1985) (`An unsolicited remark, not in response to any interrogation, does not fall within the Miranda rule'); United States v. Lawrence, 952 F.2d 1034, 1036 (8th Cir.[1992]) (`The protections afforded a suspect under [Miranda] apply only when the suspect is both in custody and being interrogated. A voluntary statement made by a suspect, not in response to interrogation, is not barred by the Fifth Amendment and is admissible with or without the giving of Miranda warnings.'), cert. denied, 503 U.S. 1011, 112 S.Ct. 1777, 118 L.Ed.2d 434 (1992).
"`Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated.... Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by [the holding in Miranda].'

Miranda v. Arizona, 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). See also Britton v. State, 631 So.2d 1073, 1078 (Ala.Cr.App.1993); Williams v. State, 601 So.2d 1062, 1072 (Ala.Cr.App.1991)."
Worthington v. State, 652 So.2d 790, 792-93 (Ala.Cr.App.1994). The court did not err in admitting Clark's statements into evidence.

III.
Clark argues that the State was impermissibly allowed to present evidence of extraneous crimes allegedly committed by Clark. He contends that the evidence of these crimes was irrelevant to the present crime for which he was accused and was highly prejudicial. Specifically, Clark complains that the prosecutor stated during opening arguments:
"I expect the testimony will be that you will hear that Tom Posey was attempting to help the Defendant get a job. In fact, he had even helped make the Defendant's bond to get him out of jail. And those conditions specifically saidJudge Charles Woodham will take the stand as a district judge and testify and tell you that...."
R.T. at 488. Clark also argues that the following testimony given by Henry County District Judge Woodham was irrelevant to the facts of the case, was highly prejudicial, and, therefore, was erroneously admitted:
"Q. If I could, Judge Woodham, would you please go to on or about December the 7th, 1993. I realize you have had a lot of cases and seen a lot of people. But do you have any independent recollection on December the 7th, 1993, whether or not there were any conditions placed upon a bond of Thomasexcuse me, of Andrew Bert Clark with Thomas Posey making that bond?
"A. I do.
"Q. Could you tell the jury what you recall that was, Judge Woodham?
"A. I recall, first of all, that the bond was reduced about that time from $20,000 to $12,000. And I also recall that it was done on the joint agreement between the State and the defendant's *1133 attorney. And at the time, I put a restriction on the bond of a condition of release that the defendant remain outside of Henry County and Houston County while he was on bond.
"Q. Now, could you please tell the ladies and gentlemen of the jury, was a condition of the bondwas that on Andrew Bert Clark?
"A. It was.
"Q. And Thomas Oliver Posey [made] the bond to get him out of jail?
"A. He did.
"Q. Now, would you tell the ladies and gentlemen of the juryI'd like to go forward to on or about February the 25th of 1994. And ask, do you recall if the release order and conditions were modified or changed at that time?
"A. They were.
"Q. And could you tell the jury on March [sic] the 25th, [1994], what the conditions for the release were, if you recall?
"A. I allowed Mr. Clark to come to Henry County for a period of I think about three days. My recollection is that the purpose of it was to consult with his attorney in another case."
R.T. 525-27. This testimony, Clark contends, brought two extraneous crimes to the attention of the jury and magnified their importance because Clark, as a consequence of those crimes, was banished from Henry and Houston Counties except for a brief period when he was allowed to return to consult with his attorney.
Clark did not object to the testimony of Judge Woodham. Any error, therefore, is subject to review pursuant to the plain error rule.
"As a general rule, when a person is being tried for the alleged commission of one crime, evidence that he or she committed another illegal act that is not now charged is generally inadmissible. McLemore v. State, 562 So.2d 639 (Ala.Cr.App. 1989); Gainer v. State, 553 So.2d 673 (Ala. Cr.App.1989); C. Gamble, McElroy's Alabama Evidence § 69.01(1) (4th ed.1991)." Ex parte Land, 678 So.2d 224, 243 (Ala.1996). Notwithstanding that fact, the Court of Criminal Appeals has written:
"`We have recognized that the list of traditionally recognized exceptions is not exhaustive and fixed. See Nicks v. State, 521 So.2d [1018] at 1025 [(Ala.Cr.App.1987)]. "It must ever be borne in mind that the state may prove the accused's commission of another crime if such other crime is relevant for any purpose other than showing his guilt through the medium of bad character." C. Gamble, McElroy's Alabama Evidence § 69.01[1](1) (3d ed. 1977) ([McElroy's,] 2nd ed.)
"`"In all instances, the question is whether the proposed evidence is primarily to prove the commission of another disconnected crime, or whether it is material to some issue in the case. If it is material and logically relevant to an issue in the case, whether to prove an element of the crime, or to controvert a material contention of defendant, it is not inadmissible because in making the proof the commission of an independent disconnected crime is an inseparable feature of it."

Snead v. State, 243 Ala. 23, 24, 8 So.2d 269, 270 (1942). However, even though evidence of collateral crimes or acts may be relevant to an issue other than the defendant's character, it should be excluded if "it would serve comparatively little or no purpose except to arouse passion, prejudice, or sympathy of the jury," Spellman v. State, 473 So.2d 618, 621 (Ala.Cr.App.1985), or put another way, "unless its probative value is `substantially outweighed by its undue prejudice,'" United States v. Stubbins, 877 F.2d 42, 43 (11th Cir.), cert. denied, 493 U.S. 940, 110 S.Ct. 340 [107 L.Ed.2d 328] (1989) (quoting United States v. Beechum, 582 F.2d 898 (5th Cir.1978) (en banc), cert. denied, 440 U.S. 920 [99 S.Ct. 1244, 59 L.Ed.2d 472] (1979)).'

[Bradley v. State], 577 So.2d [541,] at 547-48 [(Ala.Cr.App.1990)]. In Alabama, evidence `is relevant if there is any logical relationship between it and the ultimate *1134 inference ... for which it is offered.' C. Gamble, supra, at § 69.91(1)."
Guthrie v. State, 616 So.2d 914, 922 (Ala.Cr. App.1993). The State contends that the evidence indicating that Clark had committed collateral crimes was both relevant and necessary to establish the facts in this case and that it was admissible as an exception to the exclusionary rule. In particular, the State submits that the fact that Posey posted Clark's bond is a relevant fact necessary to show the relationship between the accused and the victim before the murder. Furthermore, the State argues that the fact that Clark was "banished" from Henry and Houston Counties was relevant because his initial arrest in Montana was based on a violation of that order. We agree. We note that the State was not allowed to introduce evidence directly related to the other crimes allegedly committed by Clark, only evidence that Clark had been released into Posey's custody after Posey had posted Clark's bond and that Clark's arrest in Montana was based on a violation of a release order. Both facts were logically relevant to the case.

IV.
Clark argues that the trial judge improperly denied a continuance to allow him additional time to obtain his mental health records from Charter Woods Hospital. On April 7, 1995, ten days before the trial, the defendant filed a motion for a continuance, wherein he stated:
"COMES NOW the Defendant by and through his undersigned attorneys and files this motion to continue and in support thereof would allege:
"1. That only recently have the undersigned attorneys been able to locate and contact family members of the Defendant.
"2. That upon locating his mother and sister, the undersigned attorneys have learned that the Defendant has been institutionalized in Indiana, as well in Mobile, Alabama, and Dothan, Alabama.
"3. That the mental history of the Defendant is highly relevant both in the guilt phase as well as the sentencing phase of the trial, should one become necessary.
"4. That it is impossible, within the time allotted to obtained [sic] the records of the Defendant's previous mental treatment and to review same."
C.R. at 84. The defendant's medical records had been subpoenaed from Charter Woods Hospital in Dothan, Alabama, at the time of the sentencing hearing; however, Charter Woods had refused to comply with the subpoena. The lack of this evidence, Clark contends, caused the trial judge not to give proper weight to the mitigating factors offered by the defendant. The result, Clark claims, was that the trial judge overrode the jury's recommendation of life imprisonment without parole. In particular, Clark contends that the continuance requested would have allowed him to provide important evidence indicating that he had been severely abused as a child and that his mental and/or emotional problems should have been given considerable weight as mitigating factors.
"The guidelines for determining whether a trial court has abused its discretion in denying a continuance are set out in Ex parte Saranthus, 501 So.2d 1256, 1257 (Ala.1986):
"`A motion for a continuance is addressed to the discretion of the court and the court's ruling on it will not be disturbed unless there is an abuse of discretion. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973). If the following principles are satisfied, a trial court should grant a motion for continuance on the ground that a witness or evidence is absent: (1) the expected evidence must be material and competent; (2) there must be a probability that the evidence will be forthcoming if the case is continued; and (3) the moving party must have exercised due diligence to secure the evidence. Knowles v. Blue, 209 Ala. 27, 32, 95 So. 481, 485-86 (1923).'"
Fortenberry v. State, 545 So.2d 129, 138 (Ala. Cr.App.1988). In denying the motion for a continuance, the trial court stated, "Well, I will deny the motion to continue. The case has been pending a year.... [T]here is nothing the State has done or any outside set of circumstances that's caused it. It's been his hesitancy to provide this information." *1135 C.R. at 20. We agree with the trial court that any delay in obtaining Clark's mental health records was caused by Clark's own refusal to divulge their existence to his counsel. Thus, the trial court did not abuse its discretion in refusing a continuance.

V.
Clark also claims that the trial court erred in failing to instruct the jury with regard to the lesser included offenses of robbery and felony murder. He first argues that the jury could have determined that the evidence supported a finding that Clark committed a first degree robbery, but did not intend to murder Posey, i.e., that the jury could have found him guilty of felony murder. The refusal of the trial judge to charge the jury with regard to this lesser included offense, Clark claims, resulted in his unwarranted conviction for capital murder.
The judge's failure to charge the jury with regard to felony murder is subject to review under the plain error rule. Based on our review of the record, we conclude that a conviction of felony murder would have been inconsistent with the evidence presented at trial because "[t]he [victim's death was] not `unintended [death] caused by [the defendant's] dangerous conduct.'" Taylor v. State, 666 So.2d 36, 55 (Ala.Cr.App.1994) (citations omitted). Clark maintained at trial that he could not be guilty of capital murder because, although he said he did commit the murder, he did not rob the victim. Clark's attorney stated in closing argument:
"We are not asking you to let him go. No one is saying `Find Andy Bert Clark not guilty.' We are asking you to apply the law as the law is and not a verdict based on the fact that he's a bad person. I will give you that. Or what he did after he killed Tom was immoral and improper. That's possibly true too. Certainly the killing of him was immoral. Nobody would disagree with that, including Andy in his statement. But it's not capital murder.
"You are going to be instructed, I believe, that, in order to find Andy guilty based on a set of facts, that set of facts not only has to prove that he's guilty, but it has to exclude every theory of innocence, every hypothesis of innocence before you can find him guilty of capital order.
"Now, to do that, you are going to have to speculate. And I suspectI submit that you will be instructed that your verdict cannot be based on conclusions, speculation or supposition. `Probably' has no place in the vocabulary of the deliberating jury. If it's probably, it's not guilty or, in this case, not guilty of capital murder.
"There is one thing that's not probably in this case. And that'swhat's not probably is that Andy Bert Clark, Andrew Bert Clark, killed Tom Posey. That's not probably. That happened.
"Now, what are you being asked to speculate on? You are being asked to speculate that some way or another, we don't know how, in some manner, he went and dug up from some concealed place Tom Posey's PIN number to his ATM card. Or are you being asked to speculate that he just got lucky in, as Mr. Gamble [a vice president of Headland National Bank] said, the first three times of trying? And there is no indication of that."
R.T. at 891-93. Thus, Clark admitted to the murder, but claimed that he did not rob Posey. Based on the evidence offered at trial, a jury charge on felony murder would have been inappropriate. For the same reasons, the trial court's failure to give a jury instruction on the lesser included offense of robbery was also not plain error.

VI.
Citing Ex parte Weaver, 678 So.2d 284 (Ala.1996), Clark argues that the trial judge's instruction on flight led the jury to believe that the only conclusion that could be drawn from Clark's flight was that Clark was guilty. The trial judge gave the following instruction to the jury regarding flight:
"Ladies and gentlemen of the jury, in weighing the facts in the case, you may flight or attempted flight may be considered by you in regard to the consciousness of guilt of the Defendant in the case"
R.T. at 950. Clark argues that at the time the murder was committed he was under a court order not to be in Henry or Houston County and that the jury could have inferred *1136 that he was simply complying with the court order rather than fleeing to escape prosecution.
This Court discussed the law regarding flight in Ex parte Jones, 541 So.2d 1052 (Ala.1989):

"The basic rule for the introduction of evidence of flight was set forth in the early Alabama case of Bowles v. State, 58 Ala. 335, 338 (1877):
"`All evasions, or attempts to evade justice, by a person suspected or charged with crime, are circumstances from which a consciousness of guilt may be inferred, if connected with other criminating facts. Of themselves, they may not warrant a conviction, but they are relevant as evidence, and the weight to which they are entitled, it is the province of the jury to determine, under proper instructions from the court. [Citations omitted.] Flight, for which no proper motive can be assigned, and which remains unexplained, is a circumstance all authorities agree it is proper to submit to the jury, in connection with other evidence tending to show the guilt of the accused. In the old common law, the rule which passed into a maxim, was, that flight was equivalent to a confession of guilt: fatetur facinus qui judicium fugit. At the present day it is regarded as a mere criminative circumstance, indicative of a consciousness of guilt, and of an attempt to evade justice, which is subject to infirmative considerations that may deprive it of all force.'

This basic statement about evidence of flight has remained intact and basically unchanged in the law of Alabama up until this time. It is still the law. Later cases dealing with flight often state little more than the main proposition that such evidence is admissible....
"This case, involving both flight and the commission of another crime, presents an opportunity for us to make a full examination of this rule, especially in regard to evidence of flight involving other crimes.
"One of the most recent cases summarizing the Alabama rule on this subject is Beaver v. State, 455 So.2d 253, 257 (Ala. Crim.App.1984):
"`"In a criminal prosecution the state may prove that the accused engaged in flight to avoid prosecution ... as tending to show the accused's consciousness of guilt.... The state is generally given wide latitude or freedom in proving things that occurred during the accused's flight." C. Gamble, McElroy's Alabama Evidence § 190.01(1) (3rd ed.1977). "Evidence of flight is admissible even though it is weak or inconclusive or if several days have passed since the commission of the crime." Tate v. State, 346 So.2d 515, 520 (Ala.Crim.App. 1977). Evidence of flight is admissible even though that evidence involves the commission of other crimes by the accused. For the same reason, evidence that the accused resisted or attempted to avoid arrest is admissible. Additionally, the evidence that the accused was observed at the police station throwing keys in a trash can was admissible. Any act proving or tending to prove the accused's effort or desire to obliterate, destroy, or suppress evidence of a crime is relevant and admissible even if it involves evidence of a separate offense.'
"Other jurisdictions [specifically, Montana and Idaho] have reached different results....

"A good statement of the rule concerning the admissibility of evidence of flight when separate offenses are involved appears in United States v. Myers, 550 F.2d 1036 (5th Cir.1977), cert. denied, 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978):
"`Analytically, flight is an admission by conduct. Its probative value as circumstantial evidence of guilt depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior of flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged. The use of evidence of flight has been criticized *1137 on the grounds that the second and fourth inferences are not supported by common experience and it is widely acknowledged that evidence of flight or related conduct is "only marginally probative as to the ultimate issue of guilt or innocence."
"`Nevertheless, in United States v. Ballard, 423 F.2d 127 (5th Cir.1970), we stated:
"`"It is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself." Id. at 133.
"`. . . .
"`Because of the inherent unreliability of evidence of flight, and the danger of prejudice its use may entail, a flight instruction is improper unless the evidence is sufficient to furnish reasonable support for all four of the necessary inferences....
"`... The immediacy requirement is important. It is the instinctive or impulsive character of the defendant's behavior, like flinching, that indicates fear of apprehension and gives evidence of flight such trustworthiness as it possesses. The more remote in time the alleged flight is from the commission or accusation of an offense, the greater the likelihood that it resulted from something other than feelings of guilt concerning that offense.'

"550 F.2d at 1049-51.
"As Judge Johnson put it in United States v. Borders, 693 F.2d 1318, 1325-26 (11th Cir.1982), cert. denied, 461 U.S. 905, 103 S.Ct. 1875, 76 L.Ed.2d 807 (1983):
"`Human experience teaches, however, that not every act of flight constitutes an expression of guilt.... Thus, the interpretation to be [made] from an act of flight should be made cautiously and with a sensitivity to the facts of the particular case....
"`The cases in which flight evidence has been held inadmissible have contained particular facts which tend to detract from the probative value of such evidence.... The Beahm-Myers line of cases [United States v. Myers, supra, and United States v. Beahm, 664 F.2d 414 (4th Cir.1981)] thus stands for the proposition that the probative value of flight evidence is substantially weakened if the suspect was not aware at the time of the flight that he was the subject of a criminal investigation for the particular crime charged.'
"The above cases, both from this state and from other jurisdictions, clearly show that flight evidence can become so untrust-worthy when there is no evidence that the flight was motivated by the suspect's knowledge of the crime charged that the evidence's probative value is outweighed by the prejudice it produces."
541 So.2d at 1055-57. (Citations omitted; some emphasis added.) This material quoted from Ex parte Jones has also been quoted in Rogers v. State, 630 So.2d 88, 90-92 (Ala. 1992). The facts of Weaver are distinguishable from the facts of this case. In Ex parte Weaver, the defendant Weaver murdered the victim in December 1989 and left the state in September 1990. When Weaver left the state, he was not aware that he was under suspicion for the crime for which he was later accused. Clark, on the other hand, left the state almost immediately after the crime and traveled extensively, using the victim's automobile and credit cards. The immediacy of his departure, coupled with his attempt to take money from Posey's account before that departure, clearly, in our opinion, made flight pertinent for the jury to consider.

VII.
Clark argues that the trial court erred in finding, as an aggravating circumstance, that the murder was "especially heinous, atrocious or cruel." § 13A-5-49(8), Ala.Code 1975. For the following reasons, we agree.
In Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the Supreme Court of the United States held that the application of certain state death penalty *1138 statutes violated the Eighth Amendment[1] to the United States Constitution as applied to the states through the Due Process Clause of the Fourteenth Amendment.[2] The Supreme Court held that those statutes' lack of principled standards to prevent the sentencing authority from arbitrarily and capriciously imposing capital punishment rendered the application of the sentencing scheme constitutionally infirm. E.g., id. at 310, 92 S.Ct. 2726 (Stewart, J., concurring); id. at 311, 92 S.Ct. 2726 (White, J., concurring).
Since Furman, many states have revised their death penalty statutes to require that the sentencing authority consider aggravating and mitigating circumstances, thus limiting the discretion of the sentencing authority. See Maynard v. Cartwright, 486 U.S. 356, 362, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). The Supreme Court's post-Furman cases make it clear that to survive Eighth Amendment scrutiny, a factor used as an aggravating circumstance in a capital punishment statute must provide a "principled way to distinguish" cases in which the death penalty is appropriate from cases in which it is not. See, e.g., Godfrey v. Georgia, 446 U.S. 420, 433, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). The Supreme Court has held that the "especially heinous, atrocious, or cruel" aggravating circumstance provides such a principled distinction only where the state appellate courts employ a consistent and narrow interpretation of that circumstance to channel the discretion of the sentencer. See Cartwright, 486 U.S. at 365-66, 108 S.Ct. 1853 (upholding the Oklahoma Court of Criminal Appeals' interpretation of the "especially heinous, atrocious, or cruel" aggravating circumstance to require, before a death sentence is imposed, a finding that the victim was tortured or was caused to suffer serious physical abuse).
In Lindsey v. Thigpen, 875 F.2d 1509 (11th Cir.1989), the United States Court of Appeals for the Eleventh Circuit upheld this Court's application of the "especially heinous, atrocious or cruel" aggravating circumstance[3] because this Court's application of it provided a "principled way to distinguish" cases in which the death penalty is appropriately imposed from cases in which it is not. Id. at 1513, 1515 (upholding our application of Ala. Code 1975, § 13A-5-49(8) and quoting Godfrey, 446 U.S. at 431, 100 S.Ct. 1759). The Eleventh Circuit emphasized that the Alabama appellate courts' interpretation of § 13A-5-49(8) passed muster under the Eighth Amendment because this Court and the Court of Criminal Appeals had consistently defined "especially heinous, atrocious or cruel" to include only "those conscienceless or pitiless homicides which are unnecessarily torturous to the victim." Lindsey v. Thigpen, at 1514 (quoting Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981)) (emphasis added).
In Bush v. State, 695 So.2d 70 (Ala.Cr.App. 1995), affirmed, Ex parte Bush, 695 So.2d 138 (Ala.1997), the Court of Criminal Appeals addressed the defendant Bush's argument that his crime, an execution-style murder, was not "especially heinous, atrocious or cruel" and that the trial court therefore erred in finding the aggravating circumstance:
"While the [defendant] correctly points out that we have upheld findings of the existence of the aggravating circumstance that the crime was especially heinous, atrocious, or cruel in cases where the victim suffered unnecessary torture, he ignores the line of cases holding that execution-type slayings evincing a cold, calculated *1139 design to kill fall into the category of especially heinous, atrocious, or cruel. [Citations omitted.]
"In fact, the precise issue raised ... here was raised in the first trial, and in Bush I [Bush v. State, 431 So.2d 555 (Ala. Cr.App.1982)], where in affirming [the capital sentence], we specifically held:
"`[F]or the reasons set out by the trial court, this capital offense was especially heinous, atrocious or cruel when compared to other capital offenses. Execution-type slayings evincing a cold, calculated design to kill, fall into the category of heinous, atrocious or cruel. Vaught v. State, 410 So.2d 147 (Fla.1982); Combs v. State, 403 So.2d 418 (Fla.1981); Armstrong v. State, 399 So.2d 953 (Fla.1981); Alvord v. State, 322 So.2d 533 (Fla.1975), cert. denied, 428 U.S. 923, 9 [96] S.Ct. 3234, 49 L.Ed.2d 1226 (1976). We recognize that an instantaneous death caused by gunfire is not ordinarily a heinous killing. Odom v. State, 403 So.2d 936 (Fla.1981). However, when a defendant deliberately shoots a victim in the head in a calculated fashion to avoid later identification, after the victim has already been rendered helpless by gunshots to the chest, such "extremely wicked or shockingly evil" actions may be characterized as especially heinous, atrocious or cruel. Hargrave v. State, 366 So.2d 1, 5 (Fla.1978).'
431 So.2d at 560-61. In reviewing our opinion in Bush I, a portion of which is quoted above, the Alabama Supreme Court stated, `We concur with the appellate court's conclusion that Bush's death sentence was properly arrived at and is appropriate.' Ex parte Bush, 431 So.2d [563] at 565 [(Ala.1983)]. See also Ex parte Rieber, [663 So.2d 999, 1003-05 (Ala.1995)], (quoting Bush I with approval in upholding the trial court's finding that the executiontype killing of the victim was especially heinous, atrocious, or cruel)."
695 So.2d at 84. In Bush, the trial court made the following findings in its sentencing order:
"`The Court does find from the evidence presented during the 1991 trial, which this Court has carefully considered, that the capital offense was especially heinous, atrocious or cruel compared to other capital offenses. This finding is based upon the evidence at trial that Larry Dominguez had already been shot and was stumbling or staggering out of the restroom when the Defendant shot him again. The evidence at trial was that the murder was committed so that the Defendant could eliminate an eyewitness to the robbery.
"`The Court finds from the evidence presented that William Bush deliberately shot Larry Dominguez in the head in a calculated fashion to avoid later identification after the victim had already been critically wounded. As previously noted, the killing of Larry Dominguez was an execution-type killing and was followed within approximately one hour by another murder of the same nature.'"
Bush v. State, 695 So.2d at 84-85 (emphasis added).
This Court has affirmed findings that certain "execution style" murders were "especially heinous, atrocious or cruel." See, Rieber v. State, 663 So.2d 985, 992-93 (Ala.Cr. App.1994), aff'd, 663 So.2d 999 (Ala.1995) (the victim had been stalked by the defendant before the murder; the victim was very much afraid of the defendant; she was robbed and was shot in the wrist and then in the head; she was alive when she was found, but subsequently died); Wright v. State, 494 So.2d 726, 744 (Ala.Cr.App.1985), aff'd, 494 So.2d 745 (Ala.1986) (trial court found that the two victims were murdered "in order that they would not be witnesses" and that they "were each shot in the head [and] slowly died in a pool of blood"); Lawhorn v. State, 581 So.2d 1159, 1174 (Ala.Cr.App.1990), aff'd, 581 So.2d 1179 (Ala.1991) (victim was run down and was "confronted with the barrel of a shotgun in his face"; he was shot and shot again after getting back up; he was then shot three times while lying on the ground "trapped and making gurgling noises"). In those cases cited here, the victims were aware of what was happening to them.
The victim in this case sustained five shots to the back and the head, with a final sixth shot behind the ear. Although the prosecution *1140 tried to imply during the trial that the victim had tried to "run for the woods" (R.T. at 875), the record indicates that whether Posey was in fact even conscious and aware after the initial shots were fired would be a matter of mere speculation. Dr. Alfredo Paredes testified on cross-examination:
"Q: And you indicatedyou are talking death. Bullets to the head or to the brain can certainly cause consciousness, can they notor loss of consciousness?
"A: Oh, yes. Yes.
"Q: So that, if a person is unconscious, he's not running, walking or crawling? Would you agree?
"A: Yes. It's been my experience most individuals when they get shot, you know, they are so intense and the adrenaline is rushing and all, the individual can do a lot of purpose movements and all. In other words, they don't die just like in the movies, you know, right away.
"Q: Well, I understand that. But, if it hits him in the brain and he goesbecomes unconscious, he falls, does he not?
"A: That is a possibility, yes.
"Q: And it would be mere speculation on your part to say that Mr. Posey did not lose consciousness or that he did lose consciousness? You just have no opinion as to that, do you?
"A: I don't know about the speculating side. Because I mentioned that I draw that conclusion ... from my experience, you know, after ten years of dealing with violent death, in particular the gunshot wounds.
"Q: Yes, sir. I realize that. But I don'tyou didn't give us an opinion as to whether he lost consciousness, did you?
"A: Oh, no, sir. I cannot.
"Q: And that would be speculation?
"A: Yes, sir."
". . . .
"Q: You indicated that the body wounds were non-fatal?
"A: As to which one? I'm sorry.
"Q: The shots in the back.
"A: Yes. To the back of the chest.
"Q: Not counting the head wounds now. The remainder of the shots were not fatal?
"A: Yes, sir. Uh-huh.
"Q: Okay. And I believe you said that he was still alive upon the impact of the bullets to the brain because there was some hemorrhaging?
"A: Yes, sir. That is correct.
"Q: So that would lead you to believe that the shots to the back came before the shots to the head then, would it not?
"A: It's hard to say. Most shootings happen so fast that is impossible to tell which one came first. Like I mentioned before, I arbitrarily designated this as one, two, three and four and so on. But I cannot tell which one came first and which one came last.
"Q: And you also can't tell how far apart they came?
"A: No, sir.
"Q: So that if they were all shot at once, you know, just as quick as you could shoot or there was a delay between the shots, that would also be speculation?
"A: That is correct."
R.T. at 621-25. The State urges us to hold that the "execution-style" murder in this case, for which the record does not reflect torture of the victim, is nonetheless "especially heinous, atrocious or cruel." Such an expansion of the aggravating circumstance set out in § 13A-5-49(8) to encompass a murder not involving torture, merely because the State labels the murder an "executionstyle" slaying would abandon the very interpretation that the Eleventh Circuit held critical to the constitutional application of that aggravating circumstance. Indeed, the Supreme Court of the United States has held that a state supreme court's failure to apply its previously recognized limiting construction of an aggravating circumstance, which required a finding of torture or aggravated battery of the victim, rendered the application of the aggravating circumstance unconstitutional. Godfrey, 446 U.S. at 429, 432, 100 S.Ct. 1759.
We cannot depart from the established meaning of the words enacted by the Legislature *1141 "especially heinous, atrocious or cruel"and apply those words to include murders that do not involve the infliction of torture on the victim.[4] Such a departure would abandon the essential characteristic that made our previous applications of § 13A-5-49(8) compatible with the Eighth Amendment. We are bound to retain the interpretation of "especially heinous, atrocious or cruel" that has provided a consistent and principled distinction between those murders for which the death sentence is appropriate and those for which it is not. See Cartwright, 486 U.S. at 363, 108 S.Ct. 1853; Godfrey, 446 U.S. at 433, 100 S.Ct. 1759.
We agree that this murder, like all murders, is a terrible crime; nevertheless, given our consistently applied narrow interpretation of the phrase "especially heinous, atrocious or cruel," we cannot hold that this murder was, in comparison, "especially heinous, atrocious or cruel."

Conclusion
After thoroughly reviewing the record and considering the issues raised, we find no reversible error as to Clark's conviction of capital murder. As to the conviction, the judgment of the Court of Criminal Appeals is affirmed. As discussed in Part VII of this opinion, however, the principles established by the federal courts mandate that we reverse as to the sentence and remand this case for the Court of Criminal Appeals to direct the trial court to reconsider all aggravating and mitigating circumstances, excluding the aggravating circumstance set out in § 13A-5-49(8), in determining whether the death sentence is appropriate in this case.
AFFIRMED AS TO THE CONVICTION; REVERSED AS TO THE SENTENCE; AND REMANDED.
MADDOX, SHORES, HOUSTON, KENNEDY, SEE, and LYONS, JJ., concur.
HOOPER, C. J., concurs in part and dissents in part.
HOOPER, Chief Justice (concurring in part and dissenting in part).
I agree with the majority that Clark's conviction is due to be affirmed, but I cannot agree that this murder was not especially heinous, atrocious, or cruel. I am aware of the constitutional limits on the use of this aggravating circumstance, but I believe that Clark's actions were indeed heinous. It is undisputed that Clark shot his victim six timesthree times in the chest, three times in the headwith the final shot to his victim's brain clearly intended to be the coup de grace stilling him permanently. I would find that Clark's acts evince a disregard of human life and of the suffering of his victim great enough to constitute a particularly heinous, atrocious, or cruel crime properly punishable by the death penalty.
NOTES
[1] The Eighth Amendment provides:

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."
[2] The Due Process Clause provides:

"No State shall ... deprive any person of life, liberty, or property, without due process of law...."
The Supreme Court of the United States has held that the Due Process Clause makes the Eighth Amendment's prohibition against cruel and unusual punishments applicable to the states. See Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947).
[3] Ala.Code 1975, § 13A-5-49 (1994 repl. vol.), provides in pertinent part:

"Aggravating circumstances shall be the following:
". . . .
"(8) The capital offense was especially heinous, atrocious or cruel compared to other capital offenses."
[4] Unlike the Alabama Legislature, the Florida Legislature has amended its death penalty statute to include a distinct aggravating circumstance for "cold, calculated, and premeditated" murders. Fla. Stat. Ann. § 921.141(5)(i) (West 1998). We note that execution-style murders generally implicate the "cold, calculated, and premeditated" aggravating circumstance, not the "heinous, atrocious, or cruel" circumstance. Hartley v. State, 686 So.2d 1316, 1323 (Fla.1996) (discussing Fla. Stat. Ann. § 921.141(5)(i) and (h)), cert. denied, ___ U.S. ___, 118 S.Ct. 86, 139 L.Ed.2d 43 (1997).